**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:04CR20044-002 |
| | ) | Hon. Kathryn H. Vratil |
| | ) | |
| PAMELA TYLER | ) | |
| Defendant. | ) | |
| | ) | |

**MOTION FOR REDUCTION IN SENTENCE UNDER THE FIRST STEP ACT
("COMPASSIONATE RELEASE")**

**INTRODUCTION**

Pamela Tyler is a 55-year-old African-American grandmother who is serving a 60-year sentence for an unsuccessful conspiracy to prevent a witness from testifying and for use of a firearm. Four of her five co-conspirators have been released; the ringleader, Andre Ivory, just received a sentence reduction from life to 30 years. As a result, this mother of six still faces 40 more years of incarceration, although the person who pulled the trigger is now free and the drug dealer who instigated the conspiracy will be released in a few years. This is Ms. Tyler's only serious offense; at sentencing, she was designated category I because her record consisted of shoplifting and minor traffic violations.

Ms. Tyler suffers from chronic kidney disease, which makes her vulnerable to COVID and gives her a higher chance of a bad outcome if she contracts the disease. The medical clinic at FCI Dublin, where she has been incarcerated, has been overwhelmed by COVID-19. The medical staff is unable to provide adequate care and she needs specialized medical attention by a

1

nephrologist to survive. Her last (and only) visit to a specialist happened in December 2020. The BOP has not followed the specialist's recommendations.

In December 2020, Dublin experienced a serious outbreak of COVID, requiring many weeks of complete lockdown. The same thing happened in January 2022, when a serious outbreak of Omicron shut operations down again, during which time prison officials deliberately moved people who were negative into units housing people sick with COVID-19.[1] As of May 4, 2022, FCI Dublin has again been listed as "Code Red for several weeks" indicating dangerous COVID infection levels.[2] FCI Dublin remains a COVID hotspot. Four women share a cell, which are so small that only one woman can stand up at a time. During a lockdown, they have no choice but to lie on their beds for 23 hours a day, as they are only given one hour to shower, correspond with family, or handle any administrative business. Social distancing is impossible. Women are routinely fed expired food in small portions and with inadequate nutrition.[3] In addition, FCI Dublin is currently under investigation by the Office of the United States Special Counsel. Problems have included widespread sexual abuse which has resulted so far in five indictments, including that of the former Warden. Officials have also failed to remediate black mold and asbestos.[4]

---

[1] January 21, 2022 email to Phyllis Hardy, the Intake Coordinator for The National Council for Incarcerated and Formerly Incarcerated Women and Girls, from KLD, a woman incarcerated at FCI Dublin describing forced movements within the prison: "it's a dumb plan they are moving us to an infected unit with sick people...I'm not happy about it." Ex. A at 1.
[2] The current COVID-level status is listed on the webpage for FCI Dublin.
[3] January 23, 2022 e-mail to Phyllis Hardy from GMR in Dublin: "I also kept [w]rappers of food we got on Friday and today. Best by date: 1/31/21!!! Bologna, cheese, bread etc. I am having people sign it and date it." Ex. A at 2.
[4] Mike Balsamo, *'Substantial likelihood' that feds committed wrongdoing in ignoring asbestos, mold at women's prison in California*, Chicago Sun Times (Apr. 12, 2022), https://chicago.suntimes.com/2022/4/12/23021894/federal-correctional-institution-dublin-california-asbestos-mold-office-special-counsel

Ms. Tyler has been incarcerated for two decades. Her husband was murdered shortly after she was incarcerated.  Nevertheless, she managed to raise her children into educated adults who are devoted to her, as are their spouses. She has a spotless disciplinary history and poses no threat to the community. Numerous people have come forward to describe how Ms. Tyler has mentored them and helped them turn their lives around. She has family support and a robust re-entry plan. She meets all the criteria for a reduction in sentence.

## STATEMENT OF THE FACTS

### A.  Personal History

Ms. Tyler was born on June 17, 1965, in Missouri to a teenaged mother, who had a third-grade education and cleaned houses to make a living. Her father, who has a police officer, died when she was young of a brain aneurism. Ex. B, at 22. Her mother re-married numerous times to a series of men who abused her, trauma that she took out on her children. *Id.* Once, young Pamela was in the car as her mother tried to get away, only to have her stepfather jump on the hood of the car and smash the windshield in. The subsequent abuse was so bad that her mother was hospitalized. *Id.* In between her marriages, Ms. Tyler's mother raised seven children as a single parent. *Id.* at 23.

Ms. Tyler herself became pregnant at 15 and dropped out of school. She had her second child at 16. She was newly married with six children by the time she was 21. *See id.* at 24-25. Ms. Tyler was a devoted mother. She worked to make sure that her children had a good childhood and encouraged them to do well in school. Five of her six children graduated high school and three received athletic scholarships at Division III schools.

3

Ms. Tyler has herself been subject to a series of physically, verbally, and psychologically abusive relationships in her adult life. One boyfriend, Edgar Union with whom she had three children, forced her to drop out of high school. *Id.* at 26. Ms. Tyler married Mr. Curley Monroe Tyler on March 21, 1987, and the pair have three children together. *Id.* at 24. Mr. Tyler physically abused Ms. Tyler throughout their marriage and has a prior arrest in Kansas for aggravated battery. *Id.*

These relationships had a grave impact on Ms. Tyler's psychological well-being. Ms. Tyler has described suffering from anxiety and depression since at least age twenty-six, citing the causes as "problems in her life and the abuse she sustained from significant others in the past." *Id.* at 25. Even before her marriage, Ms. Tyler suffered from mental health issues, attempting suicide in 1983 upon learning that her then-boyfriend Edgar Union was having an affair. She tried again again in 1986 due to Mr. Tyler's ongoing physical abuse. *Id.* at 25-26. Ms. Tyler was hospitalized but Mr. Tyler talked her out of following the psychiatric unit's recommendation for in-patient treatment. *Id.* at 26. But she stayed in the marriage for 16 years because she did not want her children to experience that instability of multiple stepfathers that she had experienced as a child. She now maintains her mental health through her devout spiritual beliefs and practices. *Id*.

**B. Relationship to Andre Ivory**

In 2002, At the time her marriage was beyond repair, Ms. Tyler was introduced to Andre Ivory who was at that time in incarcerated at a Kansas State Prison. *Id.* at 25. Although Mr. Ivory was 10 years younger than Ms. Tyler, they began corresponding. Upon his release in November 2003, their relationship became more intimate. Initially, Mr. Ivory treated her well.  He soon

became very jealous, however, and the false accusations of cheating escalated to physical abuse, followed by protestations of remorse. Again Ms. Tyler stayed with her abuser.

In 2004, Mr. Ivory was being investigated for distributing cocaine. *Id.* at 6. The Douglas County Drug Enforcement Unit arranged for a confidential informant, Tania Atkins, to make five controlled buys of crack cocaine from Andre Ivory. *Id.* Mr. Ivory was arrested and charged with drug distribution in March 2004. *Id.*

In a series of phone calls recorded in the prison where Mr. Ivory was held pre-trial, he instructed Ms. Tyler to involve her brother, Mr. Mark McGee, to organize and carry out a plan to shoot and kill the confidential informant, Ms. Atkins. *Id.* Ms. Tyler met with her brother, who then called Mr. Ivory and agreed to the plan. *Id.* at 8. Mr. McGee recruited his on-again-off-again girlfriend, Ms. Chaconie Edwards, to serve as a getaway driver for the shooter. *Id.* Ms. Kim Sanders, who knew the intended victim, was used as a go-between to reassure Ms. Atkins that she was not in danger. *Id.* at 9.

Mr. McGee recruited the shooter, Mr. Kyle Crayton, on April 10, 2004. *Id.* Ms. Tyler discussed compensating Mr. Crayton with Mr. Ivory over the phone. In the evening on April 10, 2004, Mr. McGee, Ms. Tyler, Ms. Crayton, and Ms. Edwards met at Ms. Edwards residence, where Mr. McGee provided Mr. Crayton with the gun to be used in the shooting. *Id.* Mr. Ivory continually pressured Ms. Tyler during the planning, expressing his frustration with for the slow progress in carrying out the conspiracy. *Id.*

Ms. Tyler facilitated the theft of a car, although it was ultimately not used in the shooting. *Id* Ms. Tyler then borrowed a vehicle from one of Mr. McGee's former girlfriends as a replacement. *Id.* On April 29, 2004, Mr. Clayton attempted to shoot Ms. Atkins when her car was stopped at a stop sign as she was driving home from work. He shot Ms. Atkins in the legs but his

gun jammed, and she was able to drive away. Ms. Tyler was not present at the shooting. *Id.* at 7, 10-11.

Ms. Tyler was arrested on May 20, 2004, and was charged with Conspiracy to Distribute and Possession with Intent to Distribute Cocaine Base, in violation of 21 U.S.C. §§846 and 841(a)(l) (Count 1) and Aiding and Abetting Possession with Intent to Distribute Cocaine Base, in violation of 18 U.S.C. §2 and 21 U.S.C. §841(a)(l) (Count 7), for which she was acquitted. Ex. B at 5. She was convicted of Count 8, Conspiracy to Kill a Witness to Prevent the Witness from Attending and Testifying in a Trial, in violation of 18 U.S.C. §§371 and 1512(a)(1)(A) and Count 10, Aiding and Abetting the Attempt to Kill a Witness to Prevent the Witness from Attending and Testifying in a Trial, in violation of 18 U.S.C. §§2 and 1512(a)(l)(A). She was also found guilty on Count 11, Discharging a Firearm During a Crime of Violence, in violation of 18 U.S.C. §924(c)(l). She was sentenced to 20 years on each count to be served consecutively. Ex. G at 55-56.

### C. Incarceration

#### a. *Medical Issues: Uncontrolled Hypertension and Kidney Disease*

During her incarceration, Ms. Tyler has developed several serious health conditions, including uncontrolled hypertension, stage 3 kidney disease, and a heart condition. Ex. C at 55-56. Uncontrolled hypertension can result in irreversible damage to the heart, kidneys, and brain.[5] A recent study by the European Society of Cardiology reports that individuals with high blood pressure "have a two-fold increased risk of dying from the coronavirus COVID-19 compared to

---

[5] American Kidney Fund, "Stages of Chronic Kidney Disease (CKD)." Accessed August 17, 2021. https://www.kidneyfund.org/kidney-disease/chronic-kidney-disease-ckd/stages-of-chronic-kidney-disease/

patients without high blood pressure."[6] For the past two year, Ms. Tyler has had consistently elevated blood pressure readings. In June 2020, Ms. Tyler brought her concerns about her blood pressure levels to the attention of the medical staff, who monitored her pressure for a week. Ex. C at 105. Despite readings of 170/90 (June 8, 2020); 227/115 (June 10); and 187/104 (June 12), the BOP discontinued monitoring without taking any action. *Id* at 125. The American Heart Association considers sustained high blood pressure readings to be a hypertensive "urgency," requiring immediate medical attention.[7]

Hypertension is a major risk factor for heart failure; 75% of patients who suffer heart failure have hypertension.[8] An echocardiogram taken in July 2018, revealed that she has "grade 3 severe diastolic widths restricted filling." This condition has been associated with an increased risk of mortality in hypertension and chronic renal failure.[9] *Id* at 102. This condition makes Ms. Tyler's abnormally high blood pressure readings even more concerning. In August 2020, Ms. Tyler's blood pressure was monitored for two weeks, producing results of 169/92 (August 14); 215/110 (Aug. 17); 177/102 (Aug. 18); 198/115 (Aug. 19); 190/110 (Aug. 24); 180/110 (Aug. 26). Again, the monitoring was stopped in spite of the abnormal results.

---

[6] *High blood pressure linked to increased risk of dying from COVID-19,* European Society of Cardiology, (June 5, 2020), https://www.escardio.org/The-ESC/Press-Office/Press-releases/High-blood-pressure-linked-to-increased-risk-of-dying-from-COVID-19.

[7] American Heart Association, Hypertension Guideline Toolkit, http://aha-clinical-review.ascendeventmedia.com/books/aha-high-blood-pressure-toolkit/2/, page 5

[8] Keith C. Ferdinand, and Carola Maraboto, *Is Electrocardiography-Left Ventricular Hypertrophy an Obsolete Marker for Determining Heart Failure Risk With Hypertension?* Journal of the American Heart Association. 2019;8 (Apr. 4, 2019), https://doi.org/10.1161/JAHA.119.

[9] Halley CM, Houghtaling PL, Khalil MK, Thomas JD, Jaber WA. *Mortality Rate in Patients With Diastolic Dysfunction and Normal Systolic Function.* Arch Intern Med. 2011;171(12):1082–1087. doi:10.1001/archinternmed.2011.244

Hypertension and kidney disease are highly correlated, and their co-occurrence heightens the risk for negative outcomes. Recent data suggest that patients with pre-existing kidney disease are more likely to develop complications if infected with Covid-19.[10]  Ms. Tyler's last blood screening on August 19, 2021, showed her creatinine level to be 1.46. *Id* at 68. Healthy kidneys can filter out creatinine, a waste product the comes from the usual wear and tear of muscles.[11] Normal creatinine levels for women are .59-1.04 mg/dL.[12]  The August 2021 test also showed her Glomerular Filtration Rate (GFR), which is used to measure kidney function, was 37. *Id.* at 68. The ideal GFR score is 100 and anything under 60 is considered abnormal. *Id.* at n.11. She had similar results with a test in May, which showed creatinine as 1.48 and her GFR as 37. *Id* at 36. Six months earlier, in November 2020, her numbers were 1.43 and 38: although her creatinine level remained relatively steady from 1.45 obtained in October, her GFR reading had dropped 15 points from 53. *Id* at 97; *see also* Medical Records at 107 (noting increase in Creatinine to 1.5 and decrease in GFR). These results indicate worsening stage-3 kidney failure. Concerned by her deteriorating kidney condition, staff at FCI Dublin requested a nephrologist consult in October 2020, that took place on December 7, 2020. *Id* at 97; Ex. F, (Warden Request for CR). It appears Ms. Tyler did see a nephrologist but there is no specialist report. *Id* at 37. The BOP declined to provide the medication the doctor recommended, however. *Id* at 44. She has not received any additional testing since August 2021.

---

[10] Prince Dadson et. al., *Underlying Kidney Diseases and Complications for COVID-19: A Review*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7719811/

[11] American Kidney Fund, Serum creatinine test, (April 20, 2022) https://www.kidneyfund.org/all-about-kidneys/tests/serum-creatinine-test

[12] Mayo Clinic, *Creatinine Tests*, https://www.mayoclinic.org/tests-procedures/creatinine-test/about/pac-20384646#:~:text=Serum%20creatinine%20level&text=Serum%20creatinine%20is%20reported%20as,65.4%20to%20119.3%20micromoles%2FL)

Kidney function is also closely linked to immune function.[13] Chronic kidney disease affects the innate and adaptive-response immune systems, thus weakening the ability to fight off infections such as COVID.[14] The kidneys and the immune system are closely related, and the kidneys are susceptible to immune-mediated diseases.[15] Pre-existing kidney disease associated with higher death rates and a short window between contracting COVID-19 symptoms and admission to an intensive care unit (ICU).[16] Ms. Tyler suffers from uncontrolled hypertension, a heart condition, and worsening kidney disease, all of which indicate high vulnerability to COVID.

### b. *Vaccination Policy*

On October 13, 2021, the Federal Bureau of Prisons published a COVID-19 Guidance to help direct all adults who are eligible to receive the vaccination based on BOP's criteria.[17] Under BOP policy, all incarcerated people were eligible to be vaccinated. Ms. Tyler was vaccinated with two doses starting in November 2021. *Id* at 29-30. Under BOP Policy, moderately and severely immunocompromised people are supposed to get a third dose but that has not happened

---

[13] Eric Judd and David A. Calhoun, *Management of Hypertension in CKD: Beyond the Guidelines*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4445132/
[14] Overall immune profile and effect of chronic kidney disease on vaccination schedule. (2016). *Indian Journal of Nephrology*, *26* (Suppl 1), S2–S4; S6, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4928526/
[15] J Tecklenborg, D Clayton, S Siebert, S M Coley, The role of the immune system in kidney disease, *Clinical and Experimental Immunology*, Volume 192, Issue 2, May 2018, Pages 142–150, https://doi.org/10.1111/cei.13119
[16] Jennifer E. Flythe, Magdalene M. Assimon, Matthew J. Tugman and et al. Characteristics and outcomes of individuals with pre-existing kidney disease and COVID-19 admitted to intensive care units in the United States. American Journal of Kidney Disease, Volume 77, Issue 2, 2021, 190-203, 192 & 196. https://doi.org/10.1053/j.ajkd.2020.09.003.
[17] Federal Bureau of Prisons, COVID-19 Vaccine Guidance, Bureau of Prisons (October 13, 2021), https://www.bop.gov/resources/pdfs/covid_19_vaccine_guidance_v14_0_2021.pdf, pg. 4.

in Ms. Tyler's case.[18] She will be eligible for her first booster shot this year at the end of May, as

the CDC recommends for individuals who have underlying medical conditions or increased

exposure to COVID-19.[19] To date she has not been offered a booster shot.

      *c.   COVID at FCI Dublin*

The Bureau of Prisons has been operating under a code level system that indicates the

modifications that each prison is undertaking based on the risk of a COVID outbreak.[20] FCI

Dublin has spent most of 2022 on Code Red, which means that the "full pandemic plan" is in

effect.[21] Programming and recreation are suspended, and movement of incarcerated people is

severely limited. During a lockdown, Ms. Tyler is therefore unable to follow standard medical

advice for kidney disease, which includes being active for 30 minutes a day and following a

healthy diet, including limiting potassium and phosphorus.[22] Instead, she must remain locked in

her cell with three other women, which is so small that only one person can stand up at a time.[23]

---

[18] *Id.* at 5.

[19] *Id.*

[20] Bureau of Prisons, COVID-19 Modified Operations Guide,
https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp, (last visited Apr. 5, 2022)

[21] The Bureau of Prisons posts the current status of each facility on its webpage. FCI Dublin was on Code Red in January-February due to an Omicron outbreak; it is currently on Code Red due to an increase in cases in Alameda County. COVID-19, https://www.bop.gov/coronavirus/, (last visited Apr. 27, 2022)

[22] https://www.kidneyfund.org/living-kidney-disease/healthy-eating-activity/kidney-friendly-eating-plan#will-my-kidney-friendly-eating-plan-change-based-on-my-stage-of-ckd

[23] This drawing was provided by a woman incarcerated in FCI Dublin to The National Council in July 2021.



*Diagram of 4-woman cell at FCI Dublin 1*

Alternatively, she may be confined to her unit. Because of the extensive lockdowns, Ms.

Tyler has not been able to exercise. She cannot maintain a reasonable diet but must consume

what is delivered to the cells, which often consists of expired food, moldy meat, or rotten fruit.

*See* n.2.

> d.   *Disciplinary History and Rehabilitation*

In her two decades behind bars, Ms. Tyler has not received a single disciplinary write-up.

She has completed hundreds of hours of education programming, including college courses and

training in skills that will help her find employment after release. Ex. D. In particular, she has

worked closely with the chaplain to create spiritual programs to help women in crisis. Ex. E. She

has mentored young women, helping them to turn their lives around and not recidivate after their

release. She is respected by both staff and the other incarcerated women.


**ARGUMENT**

## I.   MS. TYLER HAS EXHAUSTED HER ADMINISTRATIVE REMEDIES

The First Step Act allows defendants to file a motion for a sentence

reduction, after requesting that the BOP seek compassionate release on her behalf

and waiting 30 days for a response. See 18 U.S.C. §3582(c)(1)(A) (2020). After the waiting

period, the defendant may seek judicial relief whether the Warden has

denied the request or not responded. *See, e.g., United States v. Franco*, 973 F.3d 465, 468 (5th

Cir. 2020); *United States v. Alam*, 960 F.3d 831, 833-34 (6th Cir. 2020); *United States v. Raia*,

954 F.3d 594, 597 (3d Cir. 2020). Ms. Tyler has completed all of the steps necessary to exhaust

administrative remedies. She sought a reduction in sentence based on her medical condition on

January 20, 2021, which the Warden denied after 30 days on February 22, 2021. Ex. F.

Therefore, this Court may now decide her motion.

**II.    MS. TYLER'S HEALTH CONDITIONS AND THE HARSHNESS OF HER
SENTENCE MAKE HER SITUATION EXTRAORDINARY AND COMPELLING**

Pamela Tyler's current circumstances are extraordinary and compelling because she is

vulnerable to COVID and would have poor prognosis if infected. Title 18 U.S.C. §3582 allows

courts to modify and reduce a sentence of people who have exhausted their administrative rights

if a court determines that an extraordinary and compelling reason warrants a sentence reduction.

18 U.S.C. §3582(c)(1)(A). In the Tenth Circuit, district courts have the discretion to determine

what constitutes extraordinary and compelling reasons. *United States v. Maumau*, 993 F.3d 821,

827 (10th Cir. 2021).

**A.  Ms. Tyler Suffers from Medical Conditions that the CDC Has Determined Make
Her Vulnerable to COVID-19**

Ms. Tyler's circumstances are extraordinary and compelling because she suffers from

kidney disease, a heart condition, and hypertension. Since the beginning of the pandemic, courts

have appropriately relied on "CDC guidance as a reliable source of our country's best

understanding about COVID-19" and thus the guidepost for deciding when a movant's

vulnerability to the disease is "extraordinary and compelling." *United States v. Newton*, 996 F.3d

485, 489 (7th Cir. 2021); *United States v. McPhatter,* No. CR 18-578 (KM), 2022 WL 874457, at *3 (D.N.J. Mar. 23, 2022).

Ms. Tyler suffers from kidney disease and hypertension, both of which the CDC lists as conditions that increases the risk for serious complications due to COVID-19.[24] *United States v. Pickard*, No. 00-40104-01-JTM, 2020 WL 4260634, at *4 (D. Kan. July 24, 2020) (chronic kidney disease can be the basis for meeting the "extraordinary and compelling" element in the context of COVID); *United States v. Lavy*, Case No. 17-20033-JAR, at *9 (D. Kan. Jun. 15, 2020) (granting compassionate release, noting that there is "no doubt that hypertension is a prevalent comorbidity in COVID-19 patients who suffer severe or fatal illnesses as a result of the virus"). Furthermore, a movant's comorbidities must be assessed cumulatively. *Newton*, 996 F.3d at 489. Ms. Tyler's chronic kidney disease combined with hypertension makes her conditions and case extraordinary. *United States v. Pelichet*, No.-CR 19-40033, 2020 WL 7053309, at *8 (D.S.D. Nov. 24, 2020) (movant with hypertension, stage 2 kidney disease and obesity met extraordinary and compelling standard).

1. *Kidney Disease*

The Center for Disease and Control and Prevention (CDC) has determined people with certain underlying medical conditions, including kidney disease, are more likely to (a) be hospitalized, (b) need intensive care, (c) require a ventilator to help them breathe, or (d) die from COVID-19.[25]

---

[24] Center of Disease Control and Prevention, COVID-19: People with Certain Medical Conditions, CDC (Feb. 25, 2022) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.
[25] Center of Disease Control and Prevention, COVID-19: People with Certain Medical Conditions, CDC (Feb. 25, 2022) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

Ms. Tyler's most recent GFR readings were 37 and 36, which according to the American Kidney Fund puts her is in stage 3b of chronic kidney disease. Ex. C, at 68, 97.[26] This means that Ms. Tyler's kidneys have suffered moderate irreversible damage and that waste is building up in her body, causing high blood pressure and anemia. *Id.* At this point, Ms. Tyler should be seeing a nephrologist on a regular basis and taking aggressive steps to halt the deterioration of her kidneys so that she does not reach stage 4 of the disease, at which point dialysis, or a kidney transplant become necessary.[27]

Stage 3 kidney disease is a serious illness that weakens the immune system, increasing the chances of severe complications from COVID-19. Therefore, the potential of getting COVID is sufficient to establish "extraordinary and compelling" element necessary for granting compassionate release. *United States v. Johnson*, No. 18-CR-0271 (WMW/HB), 2021 WL 2498524, at *4 (D. Minn. June 3, 2021), *aff'd*, No. 21-2339, 2021 WL 6197342 (8th Cir. June 21, 2021) ("[T]he Court finds that his diagnosis of stage-three chronic kidney disease supports finding that Johnson is particularly susceptible to severe illness from COVID-19.").

Those with elevated baseline serum creatine are more likely to be admitted to the ICU and put on ventilators.[28] Ms. Tyler's creatinine levels have been elevated since 2016 and over the last 2-3 years have been consistently high. The normal range noted on Ms. Tyler's lab reports is .51-.95 mg/dL but in August 2021, the last time Ms. Tyler was tested, her creatinine level was

---

[26] American Kidney Fund, Stage 3 chronic kidney disease (CKD), https://www.kidneyfund.org/all-about-kidneys/stages-kidney-disease/stage-3-chronic-kidney-disease-ckd
[27] American Kidney Fund, Stage 4 chronic kidney disease (CKD), https://www.kidneyfund.org/all-about-kidneys/stages-kidney-disease/stage-3-chronic-kidney-disease-ckd
[28] Yichun Cheng, Ran Luo, Kun Wang, Meng Zhang, and et al., Kidney Disease is associated with in-hospital death of patients with COVID-19, Kidney International, Volume 97, Issue 5, 2020, 829-838, https://doi.org/10.1016/j.kint.2020.03.005.

1.46 mg/dL. Ex. C, Medical Records at 68. Her previous readings in 2021 were 1.48 (May) and

1.34 (February). Ex. C, at 71, 76. The readings from 2020 (1.43, 1.45, 1.32) were also high. Ex.

C, at 86, 97, 149. Ms. Tyler's peak reading of 1.50 occurred in March of 2020, a jump up from

1.34 in November 2019. Ex. C, at 162, 165. She was not able to see a nephrologist until

December 2020 and then the BOP opted not to follow his recommendation for medication, Ex.

C, at 44, meaning that Ms. Tyler's condition has not improved., Without proper medication and

care, Ms. Tyler's condition will likely progress to stage 4, requiring her to receive dialysis or

kidney transplant.

Related to her kidney disease, Ms. Tyler suffers from uncontrolled hypertension, which

has resulted in blood pressure readings as high as 227/115, which in and of itself is a medical

urgency. Ex. C, at 125. Even though some recent readings have been closer to normal, that does

not change the conclusion that Ms. Tyler's hypertension increases her already high vulnerability

to COVID. *Johnson*, 2021 WL 2498524, at *5 (finding movant "undisputedly" at risk for severe

illness due to hypertension in spite of normal readings made possible by medication).

      2. *Vaccination*

Of particular concern in this case, is the CDC conclusion that those who are

immunocompromised and receive the COVID-19 vaccination may not receive the same level of

protection as those who are not immunocompromised.[29] Vaccination status is "highly relevant"

to a request for compassionate release, but it is not dispositive. *United States v. McPhatter*, No.

CR 18-578 (KM), 2022 WL 874457, at *5 (D.N.J. Mar. 23, 2022). If an individual will not

receive the full benefit of the vaccine, and thus cannot be protected from COVID, then the

---

[29] Center of Disease and Control Prevention, COVID-19 Vaccines for Moderately to Severely
Immunocompromised People, (February 27, 2022), https://www.cdc.gov/coronavirus/2019-
ncov/vaccines/recommendations/immuno.html

extraordinary and compelling standard can be met. *United States v. Saucedo*, No. 10-30010, 2021 WL 3264410, at *5 (C.D. Ill. July 30, 2021) (observing that "a prisoner who shows that he is unable to receive or benefit from the vaccine may still rely on the compassionate release statute"). Recent scientific research has shown that only half of immunocompromised individuals who are fully vaccinated develop antibodies for COVID-19.[30]  The CDC has called for additional vaccine doses for immunocompromised people, including those with chronic renal disease.[31]

Ms. Tyler was first vaccinated on November 4, 2021, and her second dose was on November 30, 2021. Those vaccinations are now five months old and waning in efficacy. Under BOP guidelines, she is "priority level 2" for a third dose because she has "underlying medical conditions," as do many others in the system.[32]. Although the vaccine has reduced the danger to many incarcerated people. Ms. Tyler does not receive that benefit. She is incarcerated at FCI Dublin, which has had at least three serious COVID outbreaks and is currently on Code Red lockdown status. She receives substantially less protection from the vaccine than those who have been boosted and are not immunocompromised.[33] Her health makes her situation extraordinary and compelling.

---

[30] *See* Johns Hopkins University, COVID-19 Vaccines and Immunocompromised People: Fully Vaccinated and Not Protected (July 14, 2021) https://www.jhsph.edu/covid-19/articles/covid-19-vaccines-and-immunocompromised-people-fully-vaccinated-and-not-protected.html (cited in *Saucedo*).

[31] *See* Sarah Oliver M.D., MSPH, Data and Clinical Considerations for Additional Doses in Immunocompromised People at 17 (July 22, 2021),
https://www.cdc.gov/vaccines/acip/meetings/downloads/slides-2021-07/07-COVID-Oliver-508.pdf.

[32] Federal Bureau of Prisons, COVID-19 Vaccine Guidance, Bureau of Prisons (October 13, 2021),
https://www.bop.gov/resources/pdfs/covid_19_vaccine_guidance_v14_0_2021.pdf

[33] National Kidney Foundation, COVID-19 vaccine and treatments for people with kidney disease https://www.kidney.org/coronavirus/vaccines-kidney-disease, (last visited Apr. 4, 2022)

In addition, she should be making lifestyle changes regarding diet and exercise that are impossible for someone incarcerated, especially during long-term prison lockdowns due to the pandemic. Ms. Tyler should be eating a low-sodium healthy diet, aiming to consume less than 2,300 milligrams of sodium per day. [34] Packaged foods have high levels of sodium and portion-control is important to avoid overworking the kidneys.[35] Ms. Tyler has no access to a healthy or kidney-friendly diet. Instead, the lockdowns at Dublin have meant that she has received boxed meals with expired food that lack the nutrients that she needs to function with chronic kidney disease. Impact Justice released a report that stated that Bureau of Prisons' budget cuts and inactive spending "have led to fewer hot meals, smaller portions, lower-quality protein, fewer fresh fruits and vegetables, and more ultra-processed foods."[36] Ms. Tyler is being forced to consume foods that are filled with carbohydrates and sodium, leaving no room for basic but well-needed nutritional value.[37] Ms. Tyler's health is compromised even when there is no COVID outbreak at FCI Dublin because the preventative measures have made it impossible for her to care for herself. Even without contracting COVID, the pandemic has damaged her health – and will continue to do so – creating an extraordinary and compelling situation that warrants compassionate release.

### B.  The Disparity Between Ms. Tyler's Sentence, which is Three Times Longer Than any of her Co-conspirators, Is Also Extraordinary and Compelling

---

[34] National Institute of Diabetes and Digestive and Kidney Disease, Eating Right for Chronic Kidney Disease, NIH (April 21, 2022) https://www.niddk.nih.gov/health-information/kidney-disease/chronic-kidney-disease-ckd/eating-nutrition
[35] Id.
[36] Leslie Soble, Kathryn Stroud, and Marika Weinstein, Eating Behind Bars: Ending the Hidden Punishment of Food in Prison, Impact Justice, 2020, impactjustice.org/impact/food-in-prison/#report, 6.
[37] *Id.* at 7.

On May 30, 2006, Ms. Tyler received a sentence of twenty years to run consecutively on two charges: the first for a conspiracy to kill a witness to prevent the witness from attending and testifying in the trial, and the second for aiding and abetting the attempt to kill a witness to prevent a witness from attending and testifying in a trial. Ex. G, at 3. Ms. Tyler also received a twenty-year sentence to run consecutively on a charge of discharging a firearm during a crime of violence. *Id*. In total, Ms. Tyler's sentence amounts to sixty years of imprisonment. *Id.* at 56.

Today, Ms. Tyler's sixty-year sentence stands in stark contrast to all her co-defendants. On February 1, 2022, this Court granted her co-defendant Andre Ivory's Motion for Compassionate Release, reducing his sentence from life imprisonment to 360 months followed by a special term of supervised release for 60 months. ECF Doc. 623 at 1. Although Mr. Ivory was found guilty on nine counts, whereas Ms. Tyler was convicted of three, his sentence is now half as long as hers because his terms run concurrently except for the gun charge, whereas Ms. Tyler's all run consecutively. *Id.* Mr. Ivory received relief under §401 of the First Step Act because the juvenile offense which enhanced his sentence to life no longer qualifies as a predicate for a §851 filing. ECF Doc. 617 at 1-2. Recalculating his sentence without the enhancement resulted in a 360-month sentence; the BOP's online inmate locator now lists Mr. Ivory's release date as October 17, 2029, whereas Ms. Tyler will not be free until July 6, 2055.

Mr. Ivory, a known drug dealer and instigator of the plan to kill Tania Atkins, benefitted from a change in the law that significantly reduced his original sentence. Ms. Tyler is not eligible for this reduction because she did not use or deal drugs and had no significant criminal record so that she was not subject to any sentence enhancement based on previous drug trafficking. Her sixty-year sentence is now double Mr. Ivory's thirty-year sentence, even though Mr. Ivory had a criminal history score of 13 and Ms. Tyler's was 1. *Compare* Ex. B *with* ECF Doc. 445 at 4.

Ms. Tyler's 60-year prison term constitutes a de facto life sentence. *See* UNITED STATES SENTENCING COMMISSION, LIFE SENTENCES IN THE FEDERAL SYSTEM, 27 Fed. Sent. R. 312, 315 (2015) (defining a de facto life sentence as "a sentence length of 470 months or longer."). At the time of sentencing, she and Mr. Ivory received sentences that were legally equivalent. Now Mr. Ivory has a 30-year sentence, but Ms. Tyler still faces the prospect of spending the rest of her life in prison, creating a glaring sentencing disparity.

The disparity between Ms. Tyler and Mr. Ivory's sentences creates an extraordinary and compelling circumstance that justifies a reduction in Ms. Tyler's sentence. Congress intended that the First Step Act "provide a narrow avenue for relief when there is not a specific statute that already affords relief but 'extraordinary and compelling reasons' nevertheless justify a [sentence] reduction." *United States v. McGee*, 992 F.3d 1035, 1047 (10th Cir. 2021); *United States v. Zapata*, 546 F.3d 1179, 1194 (10th Cir. 2008) ("A district court may consider sentencing disparities between co-defendants . . ."). Sentencing disparities caused by the First Step Act are an important factor for a judge to consider. *See Owen v. United States*, No. 2:03-CR-197-1, 2020 WL 7407872, at *5 (E.D. Va. Dec. 17, 2020) (stating that the "structural disparity" created by the First Step Act in 924(c) sentences warranted compassionate release). If one co-defendant is eligible for a sentence reduction under the First Step Act, the sentences of the other defendants may be adjusted as well. *See United States v. Young*, No. 10-20076-01-KHV, 2021 WL 1999147, at *4 (D. Kan. May, 19, 2021) (Vratil, J.) (noting "the uneven application of the [First Step Act of 2018] to the various defendants in the conspiracy is an extraordinary and compelling reason to reduce defendant's sentence").

Here, the application of the First Step Act creates an absurd result because Mr. Ivory – the more culpable party – now has half of the sentence of Ms. Tyler because his juvenile criminal

record no longer can support the sentence enhancement that he received when sentenced. Ms. Tyler cannot receive the same benefit because she has no juvenile record and thus did not receive an enhancement that could be rescinded under §c401 of the First Step Act. Unless this motion is granted, Ms. Tyler will serve three decades more time than Mr. Ivory, although she was found guilty of three counts in contrast to his conviction or guilty plea to nine charges. ECF No. 617.

Nothing in the record suggests that such a disparity is warranted. *United States v. Davis*, 437 F.3d 989, 997 (10th Cir. 2006) (noting that disparate sentences between co-defendants are acceptable if the facts in the record support the differing treatment). Reasons for differentiating between co-defendants include cooperation, taking a plea, testifying against others, taking responsibility, and committing to reform one's behavior. *United States v. Pena*, 953 F.3d 1016, 1026-27 (10th Cir. 2020). Evaluating these factors underscores that a sentencing disparity in Mr. Ivory's favor would be unjust. They both went to trial on the witness tampering and drug charges, but Mr. Ivory pleaded guilty to additional drug charges that were not made against Ms. Tyler. Neither of them testified, neither of them was given credit for taking responsibility, but it was Ms. Tyler who vowed to change her ways at sentencing and who has not had a single disciplinary write-up. *See* Ex. D at 1. Ms. Tyler was convicted of fewer charges than Mr. Ivory and has turned her life around; forcing her to serve 30 more years than Mr. Ivory would be manifestly unjust.

Although Ms. Tyler does not qualify for a sentence reduction under the First Step Act, the disparity created by her co-defendant's eligibility must be redressed. The First Step Act was intended to reduce overly long sentences, not create unjust results among co-defendants. A judge's obligation to make sure that co-defendants are sentenced under the same standards applies to any post-sentencing relief. If the First Step Act benefits one defendant, it should bring

a co-defendant into its ambit through a motion for a sentence reduction. *United States v. Richardson*, No. 1:08-cr-65-3, 2021 U.S. Dist. LEXIS 146579, at *16 (W.D. Mich. Aug. 5, 2021) (declaring defendant eligible for a reduced sentence, in part because the Court reduced his co-defendant's sentence from a mandatory life sentence to 324 months under the First Step Act). Disparities in sentences among co-conspirators with similar records and who have been found guilty of similar conduct should be taken into consideration when determining an appropriate sentence. *United States v. Jenkins*, 460 F. Supp. 3d 1121, 1127 (D. Colo. 2020) (citing 18 U.S.C. §3553(a)(6)). Due to her poor health and the current sentencing disparity with Mr. Ivory, Ms. Tyler's situation is "extraordinary and compelling."

### III.    THE TWO DECADES THAT MS. TYLER HAS SPENT IN PRISON HAVE SATISFIED THE PURPOSES OF SENTENCING

#### A.  Ms. Tyler poses no danger to the public.

Ms. Tyler is not a danger to the public, a prerequisite for receiving compassionate release.18 U.S.C. §3553(a)(2)(C). Her criminal record was limited to retail theft until she became involved with Andre Ivory, who manipulated her into acting against Ms. Atkins which otherwise was against her nature. Doc 502 at 15 (statement by judge that Mr. Ivory was "manipulative"). Factors to consider when gauging a person's potential danger to the community include the person's character, physical and mental health, family and community ties, sources of financial support, previous drug or alcohol abuse, and criminal history. 18 U.S.C. §3142(g)(3)(A). Ms. Tyler has multiple ailments and a strong spiritual foundation, both of which will preclude her from committing any acts of violence or engaging in criminal activity.

At sentencing, Ms. Tyler said that she had changed and had "given her life back to Christ." Ex. G, at 43. Although the Court countered "I see no evidence that you have made any

changes in your life," *Id.* at 49, the intervening 15 years have shown that Ms. Tyler kept her

word. She has been active in caring for other incarcerated women who are ill and working with

younger women to be sure that they do not return to prison. One of them, Cory Riehart, writes

"the tools I learned in prison that I attribute to success are not the tools that the faculty offered or

all the different programming, it was the programming that thanks to Miss. Pam's dedication

happened to me through Christ Jesus." Ex. H, at 18-19. Guards have also recognized Ms. Tyler

as a leader, allowing women who seek her advice or support to go into her area and speak with

her. *Id*. at 1-3. In addition, prison staff have asked Ms. Tyler to assist them in calming tense

situations between other women. *Id*. at 21.

Ms. Tyler has not received a single disciplinary write-up during the 17 years she has been

incarcerated, demonstrating her determination to stay out of trouble and her respect for authority

and the law. She has never abused alcohol or drugs. She has no contact with her co-defendants.

Ms. Tyler was given a "very lengthy sentence" to protect the public. Ex. G, at 49. After 17 years,

Ms. Tyler has demonstrated that the public no longer needs that protection

**B. Ms. Tyler has rehabilitated herself to the extent possible**

Ms. Tyler has undergone a fundamental change since she entered prison 17 years ago.

She is remorseful for her behavior. But the best evidence of rehabilitation is "a defendant's post

incarceration conduct." *Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011). Evidence of post-

sentence rehabilitation is a critical "core consideration" when adjudicating a compassionate

release motion. *United States v. Gregory*, No. 07-CR-73-JED, 2021 WL 5450692, at *4 (N.D.

Okla. Nov. 22, 2021).

Ms. Tyler is deeply committed to her Christian faith, which has inspired others. At

Dublin, Ms. Tyler has actively participated in religious services. Ms. Tyler has gained special

recognition from Margaret Ashforth, Supervisory Chaplain at FCI Dublin, for her help. She served as chapel clerk and in addition coordinated Christian celebrations, prayer groups, and classes. Ex. E. Ms. Ashforth's endorsement is notable, as letters from prison officials supporting release are rare and are especially valuable to the Court. *United States v. Rodriguez*, No. 00 CR. 761-2 (JSR), 2020 WL 5810161, at *4 (S.D.N.Y. Sept. 30, 2020) (relying extensively upon "glowing" letters from prison officials, other inmates, friends and family to grant compassionate release to a defendant convicted or torturing and murdering a police informant). Ms. Tyler acts as a spiritual leader to other women in FCI Dublin, many of whom struggle with being away from their families. Ms. Tyler's peers have referred to her as "the pillar of a Christian leader at Dublin" Ex. H at 18-19, a "true woman of God" *Id* at 15, and a "powerful force of optimism" *Id* at 16. Many of these women, now released, have carried Ms. Tyler's lessons with them even after they have returned home and re-entered society as rehabilitated, law-abiding citizens.

Ms. Tyler's rehabilitation has been exemplary, meriting serious consideration when evaluating her sentence. She began her rehabilitation immediately. *United States v. Millan*, 91-CR-685 (LAP), 2020 WL 1674058, at *9 (S.D.N.Y. Apr. 6, 2020) (granting compassionate release to a drug dealer with a life sentence because he "sought to improve himself to the utmost extent possible" in spite of his circumstances"). When Ms. Tyler entered prison 17 years ago, she knew she faced a de facto life sentence and would be 101 years old on her original release date. Nevertheless, she took all the classes available to her to learn valuable skills that she could use not only in prison, but also as a law-abiding citizen in society.

She has completed education course and received college certifications in customer service and business management. She has learned computer skills, including Microsoft Word, Excel, and PowerPoint, and she has taken a course in job hunting. Ex. D. Ms. Tyler is learning

how to cope with her trauma by taking classes on dealing with stress, conflict resolution, healing, and recovery from trauma. Ex. I. In 2016, she completed a rigorous reentry program, which reaffirmed her commitment to growth and improvement. *Id* at 27. All in all, Ms. Tyler has completed extensive programming in a range of subjects, all of which will make her readily employable should she be released. Indeed, she has maintained employment even at FCI Dublin, currently working as a Commissary Clerk—a position she has held for many years. Ex. D.

As shown by her numerous support letters, Ms. Tyler has been a role model and mother figure. She mentors young women and cares for those who are too elderly or ill to care for themselves. Her roommate, Delilah Williams, praises her "self-sacrificing love," which extends "not only [to Ms. Tyler's] unit, but the entire compound." *Id* at 1-3. Others credit her with helping them through panic attacks *Id* at 16, teaching them to manage their own traumas and negative emotions, *Id* at 28, leading them to "positive and spiritual outlet[s]," *Id* at 14, and otherwise acting as a "positive force in a negative place." *Id* at 15. Even the staff at Dublin have taken notice of Ms. Tyler's calming presence and positive reputation, sometimes turning to Ms. Tyler to help intervene when conflict arises. *Id* at 21.

### C.  Release Plan and Family Support

Once released, Ms. Tyler will not recidivate. Her six adult children and mother all live in the Kansas City area, giving her strong family and community ties. Ex. J, at 1. Ms. Tyler will reside with her son Eshawn. He and his sister Iesha provide her transportation to probation check-ins, doctor's appointments, and job interviews. *Id* at 4. All her children are committed to supporting her financially her until she can find a job; three different programs for women have already agreed to assist Ms. Tyler with employment training. *Id.* at 1.  She will also have access

to shops and public transportation. Until she finds gainful employment, she will be able to help with caring for her grandchildren, allowing her children to save money for the costs of her reintegration into society.

Under Section §3553(a)(1), a person's family support is important, and "this factor may favor sentence reduction where an inmate 'has numerous family ties, including family members who will provide for him.'" *United States v. Parker*, No. 2:98-cr-00749-CAS-1, 2020 WL 2572525, at *12 (C.D. California. May 21, 2020) (citing *United States v. Mondaca*, No. 89-CR-0655 DMS, 2020 WL 1029024, at *4 (S.D. California. March 3, 2020)). This is certainly the case for Ms. Tyler. Many of Ms. Tyler's family members, including her children and their spouses, have submitted letters detailing how much they long for her to be home. Her son Tony has expressed how difficult it is "[n]ot been [*sic*] able to have my mother here to be a part of my children life so they can know her . . . [Corrlinks is] nothing like being able to physically hug them and care for her grandchildren." Ex. H, at 4-5.  Koweta Union has called the "impact" of Ms. Tyler's absence "detrimental on all of our lives, including our children's lives" *Id.* at 12-13.

Throughout Ms. Tyler's time served, she has stayed in constant contact with her family, who will continue to function as her support system should she be released. Even while incarcerated, Ms. Tyler has been a "listening ear" and shows her care for her children and many grandchildren through phone calls and video visits. Taquay Tate writes that "Phone calls and video visits with her are so motivating because no matter what she's always making sure as a family we remain together." *Id* at 7. Another daughter, Audrina Rowe, observes "My children get excited & can't wait for Grandma Pam to video chat us . . . The bond that Pam has made with my children while being incarcerated, I can only imagine the bond they will have with her being there every day as they grow up." *Id.* at 29.  Ms. Tyler is an anchor for her entire family, even

from a distance. She yearns to meet her grandchildren in person and provide her family with the comfort that will come with her physical presence.

In short, the wealth of evidence demonstrating Ms. Tyler's rehabilitation weighs in favor of her release. Ms. Tyler knows that she cannot change the poor choices that led her to crime, but she is determined to change her future. Her self-reflection, spirituality, generosity, and the steps she has taken towards improvement while incarcerated demonstrate this fact. And with a solid release plan in place, Ms. Tyler is abundantly prepared for reentry as a productive, law-abiding member of society.

## CONCLUSION

For the reasons stated above, Ms. Gallegos respectfully requests that this Court reduce her sentence to time served with whatever conditions might be appropriate.

Respectfully submitted,

By: /s/ William Dunn
William Dunn
Wilkes & Dunn, Attorneys
and Counselors at Law
111 S. State Street
P.O. Box 273
Yates Center, KS 66783
(913) 299-0229
email: billdunnlawyer@gmail.com

/s/ Catherine Sevcenko
Catherine Sevcenko
Bar No 484218, Admitted *Pro Hac Vice*
National Council for Incarcerated and Formerly
Incarcerated Women and Girls
300 New Jersey Ave, NW #900
Washington DC 20001
617-299-2604 x703

ATTORNEYS FOR PAMELA TYLER

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this motion was served via ECF to all counsel of record,

this __th day of May, 2022.

By: /s/ William Dunn
William Dunn