# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,)
                         )
        Plaintiff,       )   Criminal Action
                         )   Case No. 04-20044-02
                         )
     vs.                 )   Kansas City, Kansas
                         )
PAMELA RENEA TYLER,      )   May 30, 2006
                         )
        Defendant.       )
_____ )

SENTENCING

BEFORE THE HONORABLE KATHRYN H. VRATIL, District Judge

TRANSCRIPT ORDERED BY:  Mr. Kerns

APPEARANCES:

For the Government:   Mr. Scott Rask
                      Mr. Leon Patton
                      Mr. Tristram Hunt
                      Mr. David Smith
                      Assistant US Attorneys
                      Office of the US Attorney
                      500 State Avenue
                      Kansas City, KS  66101

For the Defendant     Mr. Kurt J. Kerns
Pamela Renea Tyler:   Ariagno, Kerns, Mank & White
                      200 Landmark Square Bldg.
                      212 North Market
                      Wichita, KS  67202

Court Reporter:       Theresa E. Hallberg, RMR, CRR
                      511 US Courthouse
                      500 State Ave.
                      Kansas City, Kansas  66101
                      913-551-5647

```
1                        I N D E X                              i

2                                              Page

3                        WITNESS

4    GOVERNMENT'S WITNESS:

5       Scott Bonham:

6            Direct Examination by Mr. Rask        18

7            Cross-Examination by Mr. Kerns        22

8            Redirect Examination by Mr. Rask      27

9

10

11   Closing Argument by Government                28

12   Closing Argument by Defendant                 31

13   Further argument by Mr. Kerns                 33

14   Further argument by Mr. Rask                  43

15   Proposed Sentence                             47

16   Sentence                                      54

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Court calls United States

2     versus Pamela Renea Tyler, Case Number

3     04-20044-02.  Will counsel state their

4     appearances, please?

5          MR. RASK:  May it please the Court,

6     United States appears by Scott Rask.

7          MR. PATTON:  Your Honor, Leon Patton

8     also appears for the United States.

9          MR. HUNT:  Your Honor, Tristram Hunt

10    appearing on behalf of the United States.

11         MR. SMITH:  David Smith on behalf of

12    United States.

13         MR. KERNS:  May it please the Court,

14    defendant appears in person and through counsel

15    Kurt Kerns.

16         THE COURT:  All right.  The record in

17    this case reflects that on October 31, 2005, this

18    Court started a jury trial.  The defendant

19    appeared with counsel and on December 13, 2005,

20    the jury found that she was not guilty of Counts

21    1 and 7, but guilty as to Count 8 of the third

22    Superseding Indictment which charged her with a

23    Class C felony of conspiracy to kill a witness to

24    prevent the witness from attending and testifying

25    in the trial in violation of 18 United States

1    Code, Sections 371 and 1512(k) with reference to

2    18 United States Code, Section 1512(a)(1)(A).

3    The jury also found the defendant was

4    guilty of Count 10 of the third Superseding

5    Indictment which charged her with a Class C

6    felony of aiding and abetting the attempt to kill

7    a witness to prevent the witness from attending

8    and testifying in a trial in violation of 18

9    United States Code, Sections 2 and 1512(a)(1)(A)

10   and also with Count 11 of a third Superseding

11   Indictment which charged her with a Class A

12   felony of discharging a firearm during a crime of

13   violence in violation of 18 United States Code,

14   Section 924(c)(1).

15   The Court entered judgment in

16   accordance with that verdict and ordered that a

17   presentence investigation be conducted.  That

18   investigation is now complete.  A written report

19   has now been prepared.

20   Did the government receive a copy of

21   that report, Mr. Rask?

22   MR. RASK:  We did, Your Honor.

23   THE COURT:  Do you have any objections

24   to the findings or recommendations?

25   MR. RASK:  No, Your Honor.

4

1          THE COURT:  Mr. Kerns, did you and your

2     client also receive a copy of that report?

3          MR. KERNS:  Yes, we have, Your Honor.

4          THE COURT:  And do you and your client

5     have any objections other than those which are

6     stated in the addendum which is attached to the

7     presentence report?

8          MR. KERNS:  No.  In fact, we have one

9     less than what we stated, Your Honor.  We're

10     going to be withdrawing our objection to

11     paragraph 60, which is basically the definition

12     of bodily injury, bodily harm, in the event our

13     previously noted objection to that is hereby

14     withdrawn.

15          THE COURT:  All right.  Then that

16     leaves us with several others.  Would any of

17     these other objections have any effect at all on

18     the guidelines sentence that we would start --

19     use to start forming our calculations?

20          MR. RASK:  Your Honor, not necessarily

21     where we start, but they do impact upon certain

22     enhancements in the calculations.

23          THE COURT:  Would any of them have any

24     effect on the ultimate guideline range, though?

25     I mean, I guess individually they probably

5

1    wouldn't, but together they might.  Is that --

2            MR. RASK:  Your Honor, I think if all

3    the objections were granted, that if the Court

4    granted all the objections, then it would reduce

5    the guideline sentence.

6            THE COURT:  All right.  Let's start out

7    with the first objection which deals with the

8    burden of proof on the enhancements that could be

9    applied.  I don't think that the case you've

10   cited, counsel, United States versus Dazey, 403

11   F.3d 1147, stands for the proposition that the

12   Court's required to resolve these issues by

13   evidence beyond a reasonable doubt.

14           Is there anything else you want to cite

15   to me on that legal issue?

16           MR. KERNS:  Your Honor, the reason we

17   brought that up, there is a District Court case

18   out of Nebraska where we kind of think the law

19   may be developing.  That's our guess.  I would

20   just like to maintain that position.  And if I'm

21   wrong, I'm sure I'll be told I'm wrong again in

22   the future.

23           THE COURT:  Same goes for me, I'm sure,

24   so all right.  The Court's overruling that

25   objection.

1          The next objection deals with the

2     question whether Mr. Crayton was to be

3     compensated for killing Tania Atkins.  We've

4     dealt with the same objection in the context of

5     Mr. Ivory's sentencing and I was satisfied at

6     that time that the record does support a finding

7     that the -- that Mr. Crayton was to be

8     compensated.  That was his testimony at trial and

9     his testimony was corroborated by recorded

10    telephone conversations between Mr. Ivory and

11    this defendant on April 17, 2004.

12         I'm happy to revisit that issue for

13    you, though, and if you want to -- the government

14    to present its evidence in that regard, I'm sure

15    that Mr. Rask is prepared to do that.

16         Mr. Kerns.

17         MR. KERNS:  Your Honor, could I have 30

18    seconds with my client on that?

19         THE COURT:  Uh-huh.

20         MR. KERNS:  Judge, I think I hear what

21    the Court's saying.  We would like to maintain

22    our objection on that particular issue, but if

23    the Court wants to rely on the previous testimony

24    in the co-defendant's sentencing, we also don't

25    have an objection to that.

1          THE COURT:  It's not really evidence

2     from the co-defendant's sentencing, it's evidence

3     from the trial which we reviewed at the time of

4     his sentence.  And Mr. Rask probably has it in a

5     very concise form, but since it was all at trial

6     and I've heard it before, I don't really see any

7     reason to prolong this aspect of the sentencing.

8          MR. RASK:  Your Honor, I do have a clip

9     of the conversation prepared to play which was

10    played during the course of the trial that was

11    Government's Exhibit Number 266 during the course

12    of the trial.  And I've marked it as Government's

13    Exhibit 2 for this sentence hearing.  I've

14    provided a copy of that transcript to Mr. Kerns.

15          THE COURT:  You have?

16          Mr. Kerns, is there any reason to

17    belabor this further?

18          MR. KERNS:  No, Your Honor.

19          THE COURT:  All right.  Then this

20    objection which is listed as number 3 is

21    overruled for the reasons I've already stated.

22          The fourth objection deals with a

23    question whether Tania Atkins was physically

24    restrained within the context of section 3A1.3 of

25    the sentencing guidelines.  Again, this is an

1    evidence which the Court has addressed in

2    connection with Mr. Ivory's sentence.  Based on

3    the evidence at trial, it was my finding in that

4    case that Mr. Crayton carried out this attempted

5    murder by forcibly restraining the victim by

6    blocking her car so that she could not escape

7    while he shot at her and he intentionally rammed

8    the stolen Oldsmobile into her mini van.  And in

9    doing so, temporarily prevented her from

10   continuing on her way home from work or from

11   escaping in the attack.

12           Is there anything further that you want

13   me, Mr. Kerns, to consider in that regard because

14   I don't really see why the outcome on this issue

15   would be different in his case than in this.

16           MR. KERNS:  Your Honor, just that we

17   understand the Court's ruling that a crash did

18   constitute a restraint.  We would like to

19   maintain our objection that those acts by another

20   individual were reasonably foreseeable for Pam.

21   And we don't anticipate offering any evidence

22   along those lines, but we would like to maintain

23   that objection.

24           THE COURT:  All right.  Well, I

25   understand your position.

9

1          Based on the evidence at trial, I think

2     it was absolutely foreseeable that this would

3     happen and she was part of the planning, so I

4     think that point is not well taken.  This

5     particular objection, then, is overruled.

6          The fifth objection deals with

7     Miss Tyler's role in the offense.  The defendant

8     denies that she was a leader or organizer in the

9     conspiracy to kill Miss Atkins.  Again, I think

10    the trial evidence on this was fairly clear, but,

11    Mr. Rask, would you like to be heard on this?

12          MR. RASK:  Your Honor, the evidence

13    that we would present on this issue include

14    several telephone conversations or portions of

15    conversations between Mr. Ivory and Miss Tyler.

16    I've marked those as Government's Exhibits 3

17    through, I think it's 6, for this course of this

18    hearing and I have provided copies of those to

19    opposing counsel.  I could play those clips for

20    the Court if it would like to synthesize those

21    particular aspects.

22          THE COURT:  Let me ask, Mr. Kerns,

23    since you weren't trial counsel, you didn't have

24    the opportunity to hear all those at the time,

25    but I assume you've reviewed those portions of

1          the tapes.

2                    MR. KERNS:  I have, Your Honor.  And my

3          announcement is kind of two-fold.  One, I think

4          we've got multiple leaders and organizers.  In my

5          review of the documents and the pleadings, as

6          they allege Mr. McGee was the leader and

7          organizationer, Andre Ivory was a leader and

8          organizer, there are a whole lot of people they

9          allege to be leaders and organizers and then my

10         client is also thrown into that -- a four-level

11         enhancement of being a leader and organizer.

12                    I think the opposite take of my review

13         of the transcripts that I was able to discern,

14         there's certainly an argument, at least, to be

15         made that my client was, in fact, in love, that

16         Andre Ivory was an individual that basically

17         treated my client the way her first husband

18         treated her as far as controlling and abusive.

19         And I don't think that that rises to the level of

20         making her a leader and an organizer when it

21         appears to me that when I listen to Andre Ivory

22         whine and complain and say, you don't love me

23         unless, it appears to me that he's controlling

24         the ball.  And I don't think a four-level

25         enhancement towards Pam is appropriate.

```
 1                  I do have some additional arguments on
 2         making that regard at the close.  We would like
 3         to maintain our objections as far as Pam being a
 4         leader and organizer because my take on the
 5         evidence, and I wasn't trial counsel, but I did
 6         try to listen to as many of these things as I
 7         could, and I got left with the sense, at least
 8         the impression, that Andre Ivory, if there is a
 9         leader and organizer, it's him not her.
10                  THE COURT:  First of all, do you want
11         the government to play back these tapes?  And
12         review any of that evidence?
13                  MR. KERNS:  I know I understand the
14         Court's already heard them and I'm not a big,
15         let's be duplicitous kind of guy, so, no, Your
16         Honor.  If the Court recalls what was said, we'll
17         go that way.  And I've got a copy of it.
18         Counsel's provided me with a copy of the
19         transcript that he thinks is relevant.
20                  THE COURT:  Mr. Rask, would you like to
21         be heard on this issue?
22                  First of all, is there any reason why
23         two people couldn't be leaders or organizers?
24                  MR. RASK:  None that I'm aware of, Your
25         Honor.  I think that the comments to the
```

12

1    applicable guideline Section 3B1.1 talk about

2    distinguishing leadership and organizational

3    roles, particularly in note 4 of the commentary,

4    and I've quoted that at pages 14 and 15 of my

5    memorandum as well as the background section and

6    I think helps in understanding that.

7            I think one might assume that there

8    would be more leaders and organizers if the

9    number of participants was a higher number of

10   participants than maybe were involved in this

11   case, but I think in looking at the evidence in

12   this case, but for this particular defendant, I

13   don't think that the actual carrying out of the

14   shooting of Tania Atkins would have occurred.

15   This defendant was crucial in carrying out that

16   plan and plot because Mr. Ivory was in jail.

17           And so Miss Tyler did everything on the

18   outside that was essential and necessary for

19   Miss Edwards to be the one, for instance, to

20   store the gun, for Miss Edwards to be the one to

21   keep the stolen car at her house, for the stolen

22   car even to be stolen from the hotel in Kansas

23   City, Kansas and driven to Lawrence, Kansas, for

24   Mr. Crayton to be put in touch with Miss Edwards

25   so he could do the surveillance in Lawrence to

13

1    try to locate where Miss Atkins was employed, for

2    the encouragement for Miss Sanders to continue to

3    try to call Miss Atkins and get Miss Atkins to

4    come outside of her apartment or to go on some

5    sort of social outing so that they could try to

6    shoot Miss Atkins when she was outside her

7    residence.

8              I think all of that came from through

9    from the testimony of Mr. Crayton, Mr. Edwards,

10   and Miss Sanders, as well as the testimony of

11   Nicole Hooker during the trial.  But for

12   Miss Tyler, they would not have been able to

13   switch vehicles and use Miss Hooker's rental

14   vehicle as the escape vehicle for getting away

15   after the shooting occurred.

16             So I think for all those reasons, her

17   oversight and participation in directing the

18   activities of Mr. Crayton, Miss Edwards, and

19   Miss Sanders at various levels was essential and

20   critical for this attempted murder to take place.

21             THE COURT:  All right.  Is there

22   anything further, Mr. Kerns, on behalf of the

23   defendant?

24             MR. KERNS:  As to that objection, no,

25   Your Honor.

14

```
 1              THE COURT:  All right.  As you know,
 2     the Court listened to hours and hours -- days of
 3     recorded telephone calls between Mr. Ivory and
 4     Miss Tyler.  And I agree with you that Mr. Ivory
 5     was manipulative, but it's not really relevant to
 6     this objection why Ms. Tyler assumed the
 7     organizational role.
 8              It's abundantly clear, I would say
 9     conclusively been established by the government,
10     that she was the pivot point for this whole
11     scheme and she's the one that organized all of
12     the participants outside of the jail based on her
13     conversations with Mr. Ivory and that she clearly
14     had a leadership role which warrants the
15     four-level enhancement.  So this objection is
16     overruled.
17              Next objection deals with recruiting
18     juveniles to participate in the conspiracy.
19              MR. KERNS:  We still maintain that
20     objection, Your Honor.
21              THE COURT:  Is there anything that you
22     want to add?  Because it seems to me that the
23     record was clear that this Nuky(ph), who the
24     defendant recruited, Nuky to steal this vehicle
25     that was used in the attack from the American Inn
```

1    and then Cortez Tyler, who is age 17, and

2    Martinez Phillips, who is age 16, were recruited

3    to drive it back to Lawrence, Kansas.  So unless

4    there's a dispute about the involvement of those

5    individuals or their ages, I'm not sure what the

6    issue here would be.

7            MR. KERNS:  The only position we desire

8    to maintain is our client's involvement with

9    those individuals and whether or not they were

10   being operated at her direction.

11           THE COURT:  Okay.  All right.

12           Mr. Rask.

13           MR. RASK:  Your Honor, I think the

14   testimony from Kyle Crayton clearly established

15   that Nuky was involved in helping him steal the

16   while Oldsmobile.  No one that we were able to

17   talk to knew what Nuky's real name was or his

18   last name.  Mr. Crayton assumed that Nuky was a

19   juvenile, but he didn't know that for certainty.

20   Additionally, the testimony from Mr. Crayton, as

21   well as Miss Edwards, established that Cortez

22   Tyler and Martinez Phillips were the ones that

23   drove that vehicle or helped drive that vehicle

24   from Kansas City, Kansas back to Lawrence,

25   Kansas.  I think the records that have been

1    contained and are contained in the presentence

2    report clearly show that Mr. Tyler and

3    Mr. Phillips were under the age of 18 at the time

4    they helped transport the vehicle to Lawrence.

5           Then specifically Mr. Crayton's

6    testimony was that these three individuals were

7    recruited by the defendant to either help steal

8    the car or to transport the car from Kansas City,

9    Kansas to Lawrence, Kansas.

10          THE COURT:  That's Mr. Crayton's

11   testimony?

12          MR. RASK:  Yes, Your Honor.

13          THE COURT:  Do you disagree, Mr. Kerns,

14   that Mr. Crayton so testified?

15          MR. KERNS:  I don't disagree that he so

16   testified yet, Your Honor, I just disagree

17   there's been sufficient tie that my client had

18   any connection with this person Nuky that Kyle

19   Crayton guesses was a juvenile and the other two

20   individuals that drove the car and whether it has

21   been proved they knew the car was stolen as they

22   were driving it and whether they were aware they

23   were assisting some conspiracy.  And, more

24   importantly, Pam's involvement in that we would

25   object to.

```
1           THE COURT:  All right.  Well, from the
2    testimony of Mr. Crayton as well as that of
3    Lillian Davis, and the Court's prior findings
4    with regard to Miss Tyler's role in this offense,
5    the Court is satisfied by a preponderance of the
6    evidence that the defendant recruited at least
7    Cortez Tyler and Martinez Phillips to transport
8    the vehicle that was used in the shooting of
9    Tania Atkins and that the two-level enhancement
10   for use of the juvenile is appropriate.
11   Therefore, the objection is overruled.
12           We have one final objection which deals
13   with obstruction based on threats or intimidation
14   to Chaconie Edwards.
15           THE COURT:  I think this was also
16   covered by evidence at trial.  Is there any
17   additional evidence which the government is
18   relying on for this particular enhancement?
19           MR. RASK:  Your Honor, Miss Edwards did
20   testify about this.  I also am prepared to
21   present additional evidence regarding Kyle
22   Crayton and what happened to his mother's house
23   within hours of the verdict as well as a note
24   that he received in the jail after the trial.
25   Those are outlined in my sentencing memoranda.
```

```
 1              THE COURT:  I think we should put that
 2      evidence on.
 3              MR. RASK:  Yes, Your Honor.  We call
 4      Detective Scott Bonham.
 5         (Whereupon, the witness is duly sworn.)
 6                   SCOTT BONHAM,
 7      called as a witness on behalf of the Government,
 8      having been first duly sworn to tell the truth,
 9      the whole truth, and nothing but the truth,
10      testified as follows:
11                 DIRECT EXAMINATION
12  BY MR. RASK:
13  Q.    Thank you.  Detective, following the verdict in
14        this case, did you become aware of a drive-by
15        shooting that happened at one of -- a relative of
16        Kyle Crayton's?
17  A.    Yes.  I went and talked to Kyle Crayton about
18        that.
19  Q.    Where was it this drive-by shooting occurred?
20  A.    At his mother's house.
21  Q.    What city is that?
22  A.    Kansas City, Kansas.
23  Q.    Were you able to follow up and verify whether a
24        shooting did occur at her house?
25  A.    I did talk to his mother, Sheila Crayton.  She
```

19

```
 1              verified that the house was shot and then I also

 2              obtained a police report that was made by the

 3              Kansas City, Kansas Police Department.

 4   Q.   And when was it that this shooting --

 5              approximately when was it that this shooting

 6              occurred?

 7   A.   I believe it was on December 13th, 2005.

 8   Q.   Approximately -- within 12 hours of the verdict

 9              in this case?

10   A.   Yes.

11   Q.   And was Mrs. Crayton or any other occupant in her

12              home able to identify who had fired the shots?

13   A.   Mrs. Crayton's son was also at the residence when

14              the shots rang out and he looked outside and saw

15              a car driving away from the area.  He was

16              familiar with the type of car and he thought that

17              it was a type of car that Pam Tyler's son drives,

18              but he was not able to make a positive

19              identification on the driver or occupants.

20   Q.   And in the investigation by the police

21              department, did they find any evidence of a

22              shooting at that residence?

23   A.   They found bullet holes in the -- bullet hole in

24              the house.

25   Q.   Then when you spoke with Mr. Crayton following
```

1   the trial, did he tell you about anything else

2   that -- any other contact that he had received

3   following the jury verdict in this case?

4   A.   He said on the evening of the verdict at CCA, he

5        was in his pod and he was summoned to the door

6        that divides two pods.  The adjacent pod, Andre

7        Ivory was in that pod.  Kyle was summoned to the

8        door and he was passed a photograph under the

9        door and the photograph of his mother and son and

10       it had been torn in half.

11  Q.   Did Mr. Crayton know anyone else that was in that

12       pod?

13  A.   He didn't know who passed the note.  I don't know

14       if he knew anybody else in the pod besides

15       Mr. Ivory, but he didn't know who passed the

16       note.  But he said Mr. Ivory was the only one

17       that he -- that most likely would have done that

18       and the only one that would have known that Kyle

19       was in that particular pod.

20  Q.   Leading up to the trial, did Mr. Crayton have a

21       relationship with one of Miss Tyler's daughters?

22  A.   He was dating Pam Tyler's daughter, Coetta(ph)

23       Union.

24  Q.   And at some point in time, he and Miss Coetta

25       Union had been taking care of his son before

1          Mr. Crayton was arrested in this case, is that

2          right?

3   A.     That's right.

4   Q.     Then, Detective, during the pendency of this

5          case, did you have the occasion to interview

6          Chaconie Edwards about incidents that took place

7          while she was in custody?

8   A.     Yes.

9   Q.     And did she tell you about an incident when one

10         of Miss Tyler's sons visited her while she was in

11         the county jail in Leavenworth?

12  A.     Yes.

13  Q.     And what was it she told you about that incident?

14  A.     That he -- that Eric Union, Pam Tyler's son, had

15         came to visit and they talked about what had

16         happened to the gun in the shooting and he

17         assured her that the gun had been disposed of and

18         would not be found.  And that she should not pass

19         any information to the law enforcement.

20  Q.     And why was that?

21  A.     Just that everybody needed to stick together and

22         anybody that talked to law enforcement would be

23         dealt with.

24  Q.     Would be dealt with?  What do you mean by that?

25         What was meant by that?

1  A.    She meant that she understood that to be a veiled

2        threat, that anybody that talked would -- some

3        type of harm would come to them.

4  Q.    And was Miss Edwards aware of incidents other

5        than Miss Atkins being shot as far as how people

6        were dealt with by Miss Tyler?

7  A.    She knew the history of the family and several

8        incidents that had occurred where people were

9        threatened and intimidated.

10          MR. RASK:  No further questions, Your

11        Honor.

12          THE COURT:  Cross-examination.

13            CROSS-EXAMINATION

14  BY MR. KERNS:

15  Q.    May it please the Court.  Detective Bonham, did

16        you take part in an investigation in this Kyle

17        Crayton's mom's drive-by shooting?

18  A.    Just talking to Kyle and Sheila Crayton.  As far

19        as the actual investigation, no.

20  Q.    Would anybody follow up, to your knowledge, on

21        the location of my client's son's car that

22        supposedly fit the description of the car that

23        drove by the house?

24  A.    I don't know if they did that.

25  Q.    So whether or not the car was actually broken

```
 1              down at the American Inn Hotel at the time of

 2              this shooting, you don't even know.

 3   A.    I don't know that.

 4   Q.    Now as to what was said about this car, this son

 5              looked outside and said it looks like the kind of

 6              car that my client's son drives, correct?

 7   A.    Yes.

 8   Q.    Was he able to give a year of the car?

 9   A.    No.

10   Q.    Was he able to give a make of the car?

11   A.    I think he gave a description of a white Honda or

12              Mazda.  I would have to look at my report.

13   Q.    Can you go ahead and look at your report.

14   A.    Kyle told me that his brother said it was a white

15              Mazda.

16   Q.    So Kyle is telling you that his brother told Kyle

17              it was a white Mazda.

18   A.    Right.

19   Q.    Did you ever go talk to brother and get brother's

20              firsthand account of what went down?

21   A.    No.

22   Q.    Now Pam is in custody at the time, correct?

23   A.    Yes.

24   Q.    Did you ever order up any of the tapes?  The

25              phone calls are obviously tape-recorded between
```

24

```
 1        her and her family, we figured that part out,

 2        correct?

 3   A.   Yes.

 4   Q.   Didn't monitor any phone conversations between

 5        Pam and her son about, hey, why don't you drive

 6        by after the fact and shoot up somebody's house?

 7   A.   Not after the trial.

 8   Q.   Do you have any -- any information at all that

 9        Pam Tyler instigated this shooting at his

10        mother's house other than what you've just

11        described?

12   A.   No.

13   Q.   Now you mentioned that after the verdict, Kyle

14        also got handed a photograph, correct?

15   A.   Yes.

16   Q.   Through a door that divides two pods, correct?

17   A.   Yes.

18   Q.   Now Pam's obviously in a different section of the

19        jail than Kyle Crayton, correct?

20   A.   Yes.

21   Q.   Is she going to have any ability to pass

22        photographs underneath the cell door and get them

23        to Kyle Crayton?

24   A.   Not that I'm aware of.

25   Q.   So what I hear you telling me is, at least with
```

1    regard to passing this photograph, while it might

2    very well have been a photograph passed by

3    Anthony Ivory or somebody at his request, Pam

4    Tyler isn't going to have any ability to really

5    get that accomplished, correct, even if she

6    wanted to?

7  A.  Well, I don't know.

8  Q.  You don't have any proof of that, right?

9  A.  I've -- no.

10 Q.  Okay.  In other words, we'd have to guess whether

11    or not she had any involvement in passing a

12    photograph that was torn in half?

13 A.  Yes.

14 Q.  Now this Chaconie Edwards indicated that my

15    client's son went and visited her, correct?

16 A.  Yes.

17 Q.  Do you know whether or not Miss Chaconie Edwards

18    basically called my client's son and asked him to

19    come visit her?

20 A.  Uh, I don't recall that specifically.

21 Q.  Were you able to monitor any phone calls to see

22    whether she called the son collect and said, hey,

23    come see me?

24 A.  Uh, I didn't hear that on any of the phone calls.

25 Q.  Do you know whether or not she basically

1    requested the visit?

2 A.  No.  I don't know that.

3 Q.  Okay.  And basically, you indicated that Chaconie

4    understood son relaying what Pam said as a,

5    quote, veiled threat, correct?

6 A.  Yes.

7 Q.  Something about, well, people know how my family

8    deals with problems.  Correct?

9 A.  Something like that, yes.

10 Q.  So, just so we're clear, those statements as

11    Chaconie herself understood them, if it was a

12    threat, it was some kind of hidden threat that

13    you'd have to find meting through -- looking

14    through the words, correct?

15 A.  (No response.)

16 Q.  It's not a, hey, you say anything, we're going to

17    shoot?

18 A.  The way she explained it to me is she understood

19    perfectly what was said.

20 Q.  All right.  So it wasn't a veiled threat, it was

21    an outright threat?

22 A.  That's the way she explained it to me the way she

23    understood it.

24 Q.  And what were the exact words that this son Eric

25    relayed to Chaconie according to Chaconie?

```
 1   A.      Uh, I'd have to look them up to see what the
 2           exact words are.
 3   Q.      That's fine.
 4   A.      I'm not sure that she gave me the exact words.  I
 5           don't have that report in front of me, but the
 6           best I can remember was, you know how our family
 7           deals with problems, or you know how our family
 8           takes care of problems, or something to that
 9           effect.
10   Q.      As I understand it, it was related to Chaconie
11           basically because Eric is talking about a
12           conversation he had with Pam?
13   A.      I don't know that specifically.  That's -- I'm
14           just gathering information that she got from
15           Eric.
16   Q.      So whether or not Eric was acting on the behest
17           of Pam, again, we would have to guess, correct?
18   A.      Yes.
19                   MR. KERNS:  Thank you.
20                   THE COURT:  Any redirect?
21                   REDIRECT EXAMINATION
22   BY MR. RASK:
23   Q.      Detective, do you have the report of the drive-by
24           shooting to the Kansas City, Kansas Police
25           Department there with you?
```

28

```
 1   A.      Not the Kansas City, Kansas police report.

 2                   MR. RASK:  Nothing further, Your Honor.

 3                   THE COURT:  All right.  Anything else?

 4                   MR. KERNS:  My client was whispering in

 5           my ear.  His only follow-up question was, do you

 6           have a copy of the report?

 7                   MR. RASK:  Yes.

 8                   MR. KERNS:  I'm sorry, Judge.

 9                   Okay.  I don't have anything to follow

10           up to that.  Thank you.

11                   THE COURT:  Thank you.  You can step

12           down.

13                   (Witness excused.)

14                   THE COURT:  Any argument on this point,

15           Mr. Rask?

16                   MR. RASK:  Judge, I think reasonable

17           inferences can be drawn from the evidence that

18           was presented at trial as well as Detective

19           Bonham's testimony.  Either that or these are

20           just too many coincidences that all point to the

21           same direction.

22                   Eric Union is the son of Pam Tyler.

23           Miss Edwards testified at trial that Miss Tyler

24           told her not to testify.  As long as no one

25           talked to the police, they would all hang
```

1     together and they would be fine because there

2     wasn't any evidence.

3           Then we have Eric Union paying

4     Miss Edwards a visit in the jail saying, the

5     gun's been taken care of, as long as you don't

6     say anything, then everything's okay, but you

7     know what happens.  Well, you know what our

8     family does with problems or how they deal with

9     problems.

10           It doesn't take too much guesswork.  In

11     fact, I think it's a very reasonable and

12     plausible inference that Mr. Union went to the

13     behest and the direction of his mother to

14     indicate a specific and clear direct message to

15     Miss Edwards because Miss Edwards was no longer

16     at CCA where the defendant would have access to

17     try to control what Miss Edwards would do.

18           Then, within 12 hours of the verdict in

19     this case, a white Mazda is seen driving away

20     from the scene of Mr. Crayton's mother's home.

21     It's the same type of car that's driven by

22     Miss Tyler's son.  While we don't know who the

23     driver was, it sure seems to be very coincidental

24     that on the same day that this defendant is

25     convicted following a lengthy jury trial, that

1    the same type of car that's driven by her son is

2    seen driving away from the scene of a drive-by

3    shooting at Miss Crayton's home.

4            Similarly, within a short time of the

5    verdict, Mr. Crayton receives a photograph of his

6    son and his mother that's torn in half.

7    Mr. Crayton had been dating Miss Tyler's

8    daughter.  It's very plausible, again, that a

9    picture would have been provided through

10   Miss Tyler's family to Mr. Ivory so it could be

11   slipped under the door to communicate yet another

12   message to Mr. Crayton that, because you

13   testified, things are going to happen to your

14   family.

15           The evidence does not directly link --

16   directly show that this defendant was involved,

17   but I think if you follow the chain and you look

18   at all of these situations and all these

19   circumstances, they clearly point to the fact

20   that not only was this defendant involved in

21   organizing a scheme to eliminate a witness in a

22   federal case, but was then willing to intimidate,

23   threaten, and issue statements of vengeance to

24   witnesses so she would not be convicted in this

25   case or that there would be retribution as a

1     result of her conviction in this case.

2           THE COURT:  Mr. Kerns, anything further

3     from the defense?

4           MR. KERNS:  Just briefly, Your Honor,

5     that the argument goes -- of the government as to

6     this issue goes something like this:  Let's just

7     guess that she sent her son Eric to do a drive-by

8     because a white car was involved.  Let's just

9     guess that she sent somebody else to do a photo.

10    And let's just guess that she sent Eric to go

11    pass on a threat.  Despite the fact that when

12    she's been in jail for over two years without a

13    single disciplinary incident, she's been in a

14    completely different part of the jail than Andre

15    Ivory.

16          To impact Pam, they have to prove

17    there's a tie to Pam and that these acts aren't

18    being done separate and apart on somebody else's

19    own initiative.  And the evidence there is

20    absolutely and completely lacking, so we would

21    ask that the Court not grant that enhancement.

22          Thank you.

23          THE COURT:  All right.

24          The Court believes this enhancement is

25    warranted based on the testimony by Chaconie

```
1    Edwards that on several occasions before the
2    shooting and while she was at CCA after the
3    shooting, Miss Tyler gave warnings about what
4    would happen if anybody snitched.
5                From appearances in court at her
6    change -- well, the detention hearing, at the
7    guilty plea hearing, at the trial and at
8    sentencing, the Court finds that Ms. Chaconie
9    Edwards is a credible witness and that based on
10   her testimony, the Court finds that Miss Tyler
11   did make statements such as, you know how my
12   family or my people are and how we take care of
13   people and problems.  The Court finds that the
14   government's position with regard to those
15   particular threats is well taken.
16               The Court also finds by preponderance
17   of the evidence that Miss Tyler counseled,
18   induced, or willfully caused Eric to call on
19   Miss Edwards at -- is it CCA?
20               MR. RASK:  It was actually Leavenworth
21   County jail.
22               THE COURT:  At Leavenworth County.  And
23   also in attempt to intimidate her from testifying
24   in that context.  So that defendant's objection
25   number 7 is overruled.
```

33

```
1              That leaves us with an offense level of

2        43, a criminal history category of 1 on Counts 8

3        and 10.  That would call for a guideline range of

4        20 years on each count to run consecutive.  On

5        Count 10, ten years to run consecutive to the

6        counts on 8 and 10.

7              The government is asking that the Court

8        give an upward departure and sentence the

9        defendant to life in prison.

10             Mr. Kerns, would you like to be heard

11        on the matter of sentencing?

12             MR. KERNS:  May it please the Court,

13        Your Honor.

14             THE COURT:  Would you come forward with

15        your client?

16             MR. KERNS:  Yes, Your Honor.

17             Your Honor, we would, obviously, first

18        we would like to object to any request for a

19        upward departure.  I would like to focus a lot of

20        my arguments just on what I see and the time I've

21        had to review the evidence in this case to review

22        what I believe happened on review of the evidence

23        and also point out exactly the undisputed

24        evidence that the government doesn't object to

25        that's also in the presentence report.
```

34

```
 1              THE COURT:  Before -- I just have one
 2      very technical thing.  In the presentence report
 3      when the Probation Office addresses the prospect
 4      of an upward departure, there's a reference --
 5      paragraph 145 on page 31 says, investigative
 6      documents disclose the defendant engaged in the
 7      distribution of PCP with her ex-husband, Curly
 8      Tyler, and she assisted her boyfriend,
 9      co-defendant Anthony Harris, with his
10      distribution of crack cocaine.
11              I think that is a typographical error
12      and Anthony Harris is supposed to refer to Andre
13      Ivory.  I mean, it --
14              MR. KERNS:  Can I grab my PSI, Your
15      Honor.  I brought it with my other things and I
16      forgot to bring it.
17              THE COURT:  I recognize the name
18      Anthony Harris from a different case.
19              MR. KERNS:  Well, my comments won't be
20      addressed to that particular avenue anyway, and I
21      agree, I think that's just a typographical error
22      because I don't even know --
23              THE COURT:  I just want to make sure
24      you're not prejudiced by --
25              MR. KERNS:  I'm not.  Because I think I
```

1    figured that out for what it was right away.

2            THE COURT:  Okay.  Go ahead.

3            MR. KERNS:  Judge, what we have and

4    what I would ask that the Court to consider is to

5    look at the fact that -- and about a month now --

6    or less than a month now, we're going to have a

7    41-year-old woman that, according to our Federal

8    Sentencing Guidelines, is a criminal history

9    category I.  The first draft of the probation

10   pretrial service office report doesn't even

11   mention any upward departure, it's not until

12   Mr. Rask says, let's disect why she beat all

13   these misdemeanor offenses and let's use those to

14   create an argument that she be upward depart

15   based upon the fact that the criminal history

16   category underrepresents her somehow.

17           Well, it certainly doesn't take her

18   from a guideline sentence of 20, 20, and 10 to

19   life because she's somehow beat all these

20   misdemeanors that the government complains.

21           What I would ask that the Court take a

22   look at is also what I think went kind of

23   untouched on in the course of this trial, and

24   that is my client's cycle of violence she really

25   lived through, and this is all just right in the

1    presentence report, it starts with her mother at

2    paragraph 93 when she was married to Clayton

3    McGee and my client shared how that husband put

4    her mother in the hospital for beatings and for

5    violence.

6              Then it describes how -- of course, her

7    mother was a caring and loving mother, she's

8    present with her family that's caring and loving

9    today.  Got out of that relationship.

10             But then in paragraph 102, we have Pam

11   starting to talk about her first husband.  And,

12   again, he's abusive, he leads to not one but two

13   suicide attempts.  When she's in the hospital,

14   according to the presentence report, he's saying,

15   well, go out of the hospital, you don't even need

16   to be there.  A real caring and loving guy again.

17             And then at paragraph 106, the PSI

18   report talks about this Andre Ivory that I didn't

19   have the pleasure of getting to know, but -- or

20   the displeasure, I should say, but I can tell you

21   that, quote, investigative reports disclose that

22   he was also abusive to the defendant.  That's

23   undisputed.  That's something the government

24   didn't even object to and, in fact, that's

25   something the government agrees to.

1       And I've reviewed some of these tapes,

2    and it seems clear to me that you have Andre

3    Ivory who at times pouts, at times is jealous, at

4    times is saying, you don't love me unless.  The

5    point being, this is an overall cycle of

6    violence, and I would argue, but for the men in

7    my client's life, she wouldn't be here.  But for

8    the influences of these men that don't love her

9    unconditionally like her mother does and like the

10    people here do, these men have put conditions on

11    her since the time she was very, very young.

12       And so you have a 41-year-old mother of

13    all her kids, and you've got one letter from one

14    of her children, but all of them are here,

15    standing before you listening to the government

16    about to argue that life in prison is the

17    appropriate disposition here.

18       My Irish gut just says that's nuts.  I

19    understand that the charges are serious.  I also

20    understand that we've kind of become a let's put

21    them in a cage forever kind of society.

22       I just two weeks ago I returned from

23    Holland on a man convicted and got 18 years for

24    grave breaches of the Geneva Convention, murder,

25    crimes against humanity, and everybody was saying

1    what a harsh 18-year prison sentence is.  And I

2    say, come to Federal Court in Kansas.  You'll get

3    an idea of what that is.

4         We have a 41-year-old woman who, under

5    the guidelines of any departure, even assuming

6    you run the two concurrent, with a mandatory ten

7    year consecutive, it's looking at 30 years.

8    She's 71 and they're somehow saying that this

9    71-year-old woman, when she gets out, is somehow

10    going to be some kind of danger?  That's crazy.

11         I would argue that the guidelines are

12    advisory now.  This Court can do what it wants to

13    see what happened and the appropriate punishment

14    that should be attributed here.  And what you do

15    is I would ask that you look to the fact that if

16    you look back in the courtroom, she's got a

17    loving and supportive family.  She's got a loving

18    and supportive mother.  She's got people that

19    care about her.

20         But the men in her life that have

21    influenced her and controlled her and abused her

22    from the time she was very little right up until

23    probably the last contact she's had with her

24    co-defendant, has been a really bad influence in

25    her life.  And I would argue, but for the men in

```
 1        her life, she wouldn't be here today.  The men

 2        that said they loved her, but then used her and

 3        abused her instead.

 4                 The tapes, I recall, mandate a whole

 5        lot of, are you talking to your other guy,

 6        jealousy comments; well, nobody's doing anything

 7        to help me, kind of a poor, poor pitiful me; if

 8        you'd love me, you'd really do something for me

 9        kind of an argument.

10                 I would argue that the punishment here

11        is too severe without some type of insight into

12        the Court into seeing where she came from, which

13        is, like I said before, a huge cycle of violence

14        that has brought her here.  I would ask that the

15        Court runs Count 8 and 10 concurrently.  I

16        understand that the remaining count has to run

17        consecutive by law.  But I certainly don't think

18        that the statutory maximum is appropriate.

19                 I would ask that the Court overrule

20        this request for an upward departure to see it

21        for what it is.  It wasn't even in the first

22        draft of the report.  It was only added later at

23        the request of Mr. Rask.  And it borders on just

24        being kind of crazy under the facts of this case

25        to put this woman away for life which she's
```

1      already 41 years old with no criminal history

2      under the guidelines except one point.

3              I would ask that the Court see the fact

4      that she's not tried to commit suicide but once,

5      but twice, and imagine -- once she was pregnant.

6      Imagine the pain of a woman that would rather die

7      than to go on living with the man that was in her

8      life.  And I can see how that woman can go

9      from to being influenced by bad men and I think

10     that the Court could see that for what it is.

11             So I would ask that the Court treat my

12     client for who she is, which is a loving, caring

13     mother.  Look, we've got two rows full of people

14     that they don't just come because they think

15     their mother's some sort of criminal and want to

16     support.  They come because they love their

17     mother and they believe in their mother and her

18     daughter.  And she's got a whole lot of goodness

19     in her heart.  And I would ask that the Court see

20     that as well.  Thank you.

21             THE COURT:  You know, usually when you

22     talk about like a battered woman's syndrome or

23     something that would come up in the context of a

24     defense, you know, where the victim is acting in

25     self-defense or is lashing out against a person

1    who had been abusing her, I mean, how would that

2    really apply in this case where, granted

3    Miss Tyler may have been abused herself, but then

4    turn around and herself conspire to kill somebody

5    else who wasn't involved in the situation --

6    abusive relationship at all.  I mean, I don't

7    understand the logical connection.

8             MR. KERNS:  My point was simply all

9    about -- and, again, we're on appeal, I don't

10   mean to make any type of admissions against my

11   client, but except to say that it is clear that

12   in even battered women's syndrome cases, you have

13   situations where it doesn't take a smack from the

14   man to get a woman to act.  It takes a, you must

15   not love me unless you do something, to get them

16   to act.  And depending on whatever that abusive

17   man wants done, whether it's collect money or

18   whatever, the woman knows because she's in a

19   position, whether he's locked away or not, to be

20   hurting and to want to please and to want to

21   foster love from the person that she loves.

22             My point being that she was wasn't

23   getting a true kind of love from this guy.  She

24   was getting a controlling kind of love and a

25   manipulative kind of love.  And I would ask that

1    the Court see that as well.

2              THE COURT:  Okay.

3              Miss Tyler, is there anything you want

4    to say to the Court with regard to the crimes of

5    which you've been convicted or the sentence to be

6    imposed?

7              THE DEFENDANT:  I have changed and I

8    have given my life back to Christ and I am sorry

9    for the things that have happened.  And I just

10   ask that I have another chance.

11             THE COURT:  Mr. Rask?

12             MR. RASK:  Judge, I made some arguments

13   in this case before, particularly at the time of

14   the review of the detention hearing in this case,

15   and the type of offense that this was and how it

16   is a complete affront to the entire Criminal

17   Justice System.  And this defendant willingly,

18   voluntarily, knowingly engaged in a conspiracy to

19   kill a witness to prevent that witness from

20   testifying against her boyfriend, Mr. Ivory.

21             While the presentence report does

22   indicate that there has been some abuse in the

23   defendant's past relationships, there's no

24   indication that she suffers from any type of

25   battered woman's syndrome, there's no indication

1   that she was doing the things in this case solely

2   because she was hoping to have love from

3   Mr. Ivory.  There's no evidence to support much

4   of the argument that is being offered by the

5   defense.

6           What we do have in this case is a woman

7   who, despite not having much of a criminal

8   history, has been engaged in a multi-state

9   shoplifting scheme for years upon years and

10  brought in a number of other women into that

11  scheme, some of whom were convicted of their

12  thefts because they were brought in by the

13  defendant.  We had testimony from Nicole Hooker

14  about the conviction she received through that.

15  Through that testimony, we heard about others who

16  were involved.

17          This was not something just done by the

18  defendant, but she brought in other people to

19  help and carry out, showed them how to do this

20  scheme.  And it's difficult to even guess how

21  many thousands of dollars have been lost by

22  various retail stores because of the scheme by

23  this defendant in Missouri, Nebraska, Kansas,

24  Oklahoma, and Texas, all the places that we heard

25  testimony about from Miss Davis, Miss Hooker,

44

1      during the course of this trial.  And the

2      defendant was able to evade and avoid

3      apprehension, prosecution, and conviction from

4      all those incidents except in one instance in

5      which she has the one criminal history point for

6      the theft that as reflected in the presentence

7      report.

8              This is not a woman who has not been

9      involved in criminal activity before she walked

10     into this courthouse on these charges.  She just

11     simply is a woman who was able to avoid any

12     consequences for her illegal acts.

13             Then we have the whole issue of the

14     guidelines.  Offense level 43.  Under the way

15     that the guidelines are set up, that guideline

16     sentence could not be imposed but for the upward

17     departure that I think is clearly authorized and

18     supported in United States versus Bazile,

19     B A Z I L E, the Tenth Circuit case from 2000.

20             And because the total offense level

21     calculated in the presentence report recommends a

22     sentence of life imprisonment, which can only be

23     achieved through an upward departure on Count 11,

24     the defendant's criminal history score greatly

25     underrepresents the defendant and her criminal

45

1    activity, and, finally, because the defendant

2    used more than one juvenile to help her

3    accomplish the attempted murder of a witness in

4    this case.  And, specifically, that last

5    provision of using more than one juvenile is

6    something that's mentioned in note 3 of the

7    commentary in the United States Sentencing

8    Guidelines Section 3B1.4.

9            In looking at the statutory factors

10   under Section 3553(a) of Title 18, we have here

11   one of the most serious offenses that could be

12   committed by an individual.  But for the gun

13   jamming, Miss Atkins would be dead.  And we would

14   be here on an actual murder instead of an

15   attempted murder.  It wasn't because of anything

16   that Miss Tyler did that that gun happened to

17   jam.  I would venture to say it was providential.

18   But this defendant was willing to go the entire

19   way to have someone killed to help out her

20   boyfriend.

21           The defendant knowingly, willingly

22   participated in that, recruited other

23   individuals, did everything she could to try to

24   have that accomplished.  That type of offense

25   requires a very serious punishment.  The

1    deterrent effect that would be seen by granting

2    the sentence of the life imprisonment the

3    guidelines recommends, I think, sends an

4    appropriate message to the community that if you

5    start messing with witnesses in Federal Court,

6    then don't plan on getting back out on the

7    streets.  Because the Criminal Justice System

8    will not tolerate someone trying to take things

9    into their own hands and prevent the Criminal

10   Justice System from going the track that it's

11   supposed to follow.

12            Thank you.

13            THE COURT:  I agree with everything

14   that Mr. Rask just said except his conclusion

15   that life in prison is appropriate.  And before

16   you respond, let me tell you what I'm thinking.

17   I mean, basically we're dealing here with a

18   person whose entire lifestyle is criminal

19   behavior.  According to the presentence report,

20   she's only had 16 months of employment in 41

21   years -- of lawful employment, I should say.

22            The evidence at trial was undisputed

23   that she was the leader and organizer of a large

24   multi-state theft ring.  She participated in

25   distributing PCP and crack cocaine.  And even

1    though she was never arrested for distributing

2    drugs, it was clear that she assisted in

3    distributing illegal drugs and, in fact, helped

4    hide drugs from the officers when they executed

5    the search warrant at her residence.

6              She recruited other people to

7    participate in this large theft ring including

8    family members.

9              If you want to talk about who's abusing

10   who, I mean, I think it's just as reprehensible

11   for her to recruit family members to recruit

12   crimes as it was for Mr. Ivory to recruit her.

13   So I also agree with all of the grounds which are

14   stated in paragraphs 145 through 148 as bases for

15   an upward departure.

16             But the sentence that I would propose

17   here is 20 years on each of Counts 8 and 10

18   running consecutive to each other for a term of

19   40 years pursuant to section 5G1.2D of the

20   sentencing guidelines followed by 20 years on

21   Count 11 which would run consecutive to the

22   counts on -- or to the terms on Counts 8 and 10

23   for a total of 60 years.

24             There would be supervised release for

25   three years on Counts 8 and 10 with those terms

1    running concurrently.  And on Count 11, there

2    would be five years of supervised release which

3    would also run concurrently with Counts 8 and 10.

4         There would be special assessment of

5    $100 to the Crime Victims Fund for each count, so

6    that would be a total of $300.  And restitution

7    of $13,379.74 would be due and this obligation

8    would be joint -- a joint and several liability

9    with that of the co-defendants who are listed in

10   paragraphs 142.

11        There would be the mandatory and

12   special conditions of supervision which are

13   contained in paragraphs 130 through 137 of the

14   presentence report.  Obviously, it's mandatory

15   that she would not be allowed to purchase or

16   possess a firearm or other dangerous weapon.

17   Drug testing would be appropriate, and, in fact,

18   would be mandatory under the Violent Crime

19   Control and Law Enforcement Act of 1994.

20        DNA testing is also mandatory under the

21   revised DNA collection requirements under the

22   Justice for All Act of 2004.  And based on the

23   defendant's personal history, mental health

24   history, substance abuse history, there would be

25   special conditions regarding substance abuse

49

1        treatment, alcohol abstinence, and participation

2        in a mental health treatment program, as well as

3        a prohibition on gambling.

4               Because of the restitution obligation,

5        there would be a numerous conditions related to

6        financial reporting and restrictions.  When I

7        look at the record here, the evidence introduced

8        at trial, as well as the other matters which are

9        contained in the presentence report relative to

10       this particular offense, the defendant's past

11       criminal conduct, her background, and personal

12       characteristics, it seems to me that a very

13       lengthy sentence is necessary to address the

14       seriousness of this offense, and most

15       importantly, if nothing else, to protect the

16       public.

17              I see no evidence that you have made

18       any changes in your life or that you are prepared

19       to lead a law-abiding life if you were released

20       to the community.  And, you know, at some point,

21       we have to say, well, if nothing else, we're

22       going to protect the community from further

23       criminal activity, drugs, thefts, attempts on

24       witnesses, et cetera.  So that's basically my

25       thought.

1      I don't propose to assess any kind of

2  fine here because I don't think that you have

3  sufficient financial resources to pay any kind of

4  a meaningful fine.  And particularly, one in the

5  guideline range of 25,000 to $250,000.

6      Counsel, do you have any comment on the

7  proposed sentence?

8      MR. KERNS:  Just that we would, I

9  guess, beg the Court to reconsidering with regard

10 to its tentative sentence.  Even with the

11 statutory 20 and mandatory consecutive on the

12 other counts, I would ask that the Court -- I

13 would say that's a heck of a lot better than what

14 the Court's tentative sentence is.  She would be,

15 with good time, at least over 60 years old by the

16 time she was released.  She already has high

17 blood pressure medication that she's already on

18 along with some anxiety medication, she also

19 battled depression while she was in.

20      Basically, I would argue that the

21 tentative sentence, as considered by the Court,

22 with the current state of my client's health, may

23 amount to a life sentence just the same.  Because

24 her current state of health is not good.  She

25 has -- if -- when you look at the presentence

1     investigation report, been on the at least three

2     different types of medication that try and get

3     her physical stature corrected.

4             I would argue, Your Honor, that by

5     running Counts 8 and 10 concurrently and Counts

6     11 consecutive, that you still have a controlling

7     sentence of 30, which nobody's going to look at

8     that and say, well, gosh, that was an easy

9     sentence.  In fact, 99.9% of the public will look

10    at that and say, man, you get hammered for a

11    conviction on this type of crime.  But at least

12    there's some semblance of freedom some day.

13           With the tentative sentence as

14    proffered by the Court, I would argue it's

15    literally the same even with good time

16    reductions.  Because with the current state of

17    her health, I don't know if she'll make it that

18    long, Your Honor.

19           I would ask that the Court consider the

20    fact that, for whatever reason, you know, and we

21    can't come in and defend every accusation about

22    statewide stealing rings and PCP sellings, and

23    all of that at a sentencing, but we can say this,

24    that she's got a very loving and supportive

25    family that is at least ready and willing and

52

1    able to assist her --

2              THE COURT:  How are they able and

3    willing to assist her?  It looks like they have

4    their own problems.  I mean, it seems to me that

5    the people that would be least in the position to

6    help her lead a productive and law-abiding life

7    are the people in her family.

8              MR. KERNS:  Well, primarily her mother,

9    who I know personally is also married to a Boeing

10   retiree in Wichita with no -- he has no major --

11   he's got a good job, good retirement coming in.

12   She could -- her mother's been very supportive of

13   her.  She's ready, willing, and able.

14             THE COURT:  And how old will they be in

15   30 years?

16             MR. KERNS:  Yeah.  I guess then it

17   becomes the question, obviously, they're going to

18   be passed in 30 years, and I see the Court's

19   point there, but then the question becomes, are

20   we really going to be concerned with a

21   70-year-old heart problem, high blood pressure

22   problem woman running the streets and being --

23   doing dangerous things.

24             I would argue that certainly the 30

25   year sentence, by running both counts concurrent

1    and doing the mandatory consecutive, is more than

2    enough to meet the public position on punishment.

3    It's certainly more than enough to send a message

4    that, you know what, you can be convicted of

5    these kind of crimes, but at least it allows her

6    the opportunity at some kind of future, at least

7    in her own mind, while, God forbid, she does that

8    time.

9              THE COURT:  What about Tania Atkins'

10   future?  The rest of her life with chronic pain,

11   permanent disability, and she's lucky to be

12   alive.  I mean, I see no mitigating circumstances

13   in this case at all.  The fact that you were

14   abused, Miss Tyler, is no mitigating factor.

15   It's no excuse for you turning around and

16   conspiring to kill somebody else to help out your

17   boyfriend.

18              I mean, as far as I can see, this was

19   cold hearted, blood thirsty, calculated attempt

20   to knock off a federal witness, and I don't know

21   that I can really say much more.  I think that

22   the sentence I'm proposing is fitting -- one

23   which fits the crime and that it sufficiently

24   addresses all of the sentencing factors which the

25   federal law identifies in Section 3553(a).

54

1          Miss Tyler, is there something you want

2     to say?

3          MR. KERNS:  Can I ask her to say it to

4     me first, Your Honor?

5          (An off-the-record discussion was had

6     between the defendant and the attorney.)

7          MR. KERNS:  I appreciate the Court.  We

8     don't have anything.  My client did have a

9     statement, but I don't want, recognizing we're in

10    a position we're going to have to appeal this

11    case, obviously, I don't want her making any

12    additional statements.

13         THE COURT:  I understand.

14         MR. KERNS:  Thank you.

15         THE COURT:  The Court makes the

16    following restitution -- let me back up.

17         Mr. Rask, did you have any comment on

18    the proposed sentence?

19         MR. RASK:  No, Your Honor.

20         THE COURT:  The Court makes the

21    following restitution findings based on the

22    preponderance of the evidence and the presentence

23    report:  Number one, restitution in the amount of

24    $13,379.74 is outstanding and is a joint and

25    several liability which co-defendants Andre Lamar

1     Ivory, Chaconie Lee Anna Edwards, Kimberly Marie

2     Sanders, and Kyle Anthony Crayton.

3              Payments should be made to Lawrence

4     Memorial Hospital in the amount of $4,972.41;

5     Claims Professional Incorporated, $6,521.37;

6     Lawrence Surgery Associates, PA, $1,627; and

7     Douglas County, Kansas Drug Enforcement Unit

8     $258.96.

9              Under 18 United States Code, Sections

10    3563(a) and 3664, Miss Tyler, I'm required to

11    order restitution in the full amount of those

12    losses without considering your economic

13    circumstances.  But I do find that you lack the

14    ability to pay interest on that restitution

15    obligation, so I'm waiving interest.

16             The Court also finds that the

17    presentence investigation report is accurate and

18    orders that those findings be incorporated in the

19    following sentence:  Under the Sentencing Reform

20    Act of 1984, Ms. Tyler, it's the judgment of the

21    Court that you are hereby committed to the

22    custody of the Bureau of Prisons for 21 -- for 20

23    years, or 240 months, on each of Counts 8 and 10

24    with those terms to run consecutive to one

25    another.  And 20 years on Count 11, with that

56

1    term to run consecutive to the terms in Counts 8

2    and 10 for a total of 60 years.

3            When you're released from prison,

4    you'll be placed on supervised release for a term

5    of three years on each of Counts 8 and 10 and

6    five years on Count 11 with those sentences to

7    run concurrently.

8            Within 72 hours of when you're released

9    from custody, you'll report in person to the

10   Probation Office in the district where you are

11   released.  While you're on supervised release,

12   you will not commit another federal, state, or

13   local crime, you will comply with the standard

14   conditions of supervision that the Court has

15   adopted as well as the mandatory and special

16   conditions which I just outlined.

17           The Court orders that you pay a special

18   assessment to the Crime Victims Fund, which is

19   $100 on each of the three counts for a total of

20   $300, and restitution as I just outlined.

21           The payment on the special assessment

22   and the restitution are due immediately.  You can

23   pay those while you're in the custody of the

24   Bureau of Prisons in payments of not less than

25   10% of the funds which are deposited into your

1       inmate trust fund account each month.

2            When you're released from prison, and

3       placed on supervised release, those monthly

4       payments will be not less than 5% of your monthly

5       gross household income throughout the term of

6       your supervision starting 30 days after you are

7       released.

8            The Court does advise both you and the

9       government that you have rights to appeal this

10      sentence under 18 United States Code, Section

11      3742.  If you want to appeal and you can't afford

12      the cost of doing that, then you can ask for

13      leave to appeal in forma pauperis, which means

14      without prepayment of the costs of appeal.  Also,

15      if you request, the Clerk of the District Court

16      will file and prepare a notice for you.

17            Do you understand?

18            THE DEFENDANT:  Yes.

19            THE COURT:  Is there anything further?

20            MR. RASK:  Nothing by the United

21      States, Your Honor.

22            MR. KERNS:  No, Your Honor.

23            THE COURT:  All right.  Court's in

24      recess.

25              *   *   *   *   *   *   *   *

58

1

2

3

4

5                    C E R T I F I C A T E

6

7

8            I, Theresa E. Hallberg, Certified

9    Shorthand Reporter, do hereby certify that the

10   foregoing transcript is a true and correct

11   transcript of my notes in said case to the best

12   of my knowledge and ability.

13            SIGNED, OFFICIALLY SEALED, AND FILED

14   WITH THE CLERK OF THE UNITED STATES DISTRICT

15   COURT this _____ day of _____, 2006.

16

17

18

19                    S/  Theresa E. Hallberg
                     Theresa E. Hallberg, RMR,CRR
20

21

22

23

24

25